ESTATE OF EMMA HILLEBRANDT, DECEASED, PATRICK J. NELSON, PERSONAL REPRESENTATIVE, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Estate of Hillebrandt v. Commissioner
Docket No. 26610-81.
United States Tax Court
T.C. Memo 1986-560; 1986 Tax Ct. Memo LEXIS 43; 52 T.C.M. (CCH) 1059; T.C.M. (RIA) 86560; November 24, 1986. Patrick J. Nelson, for the petitioner. Robert L. Archambault, for the respondent. PARKER
MEMORANDUM FINDINGS OF FACT AND OPINION PARKER, Judge: Respondent determined a deficiency in petitioner's Federal estate tax in the amount of $150,291.07. After numerous concessions, as set out in the parties' stipulation of facts, the sole issue for decision is the fair market value of a tract of real estate (hereinafter referred to as "the Hillebrandt farm") at the date of decedent's death. FINDINGS OF FACT Some of the facts have been stipulated and are so *44 found. The stipulation of facts and exhibits thereto are incorporated herein by this reference. Emma Hillebrandt (hereinafter decedent) died on February 13, 1978. At the time of her death, she was a resident of Buffalo County, Nebraska. Robert H. Hillebrandt, the only surviving child of decedent, was duly appointed personal representative of decedent's estate. As personal representative, Robert Hillebrandt filed the Federal estate tax return on behalf of decedent's estate on November 14, 1978, with the District Director of Internal Revenue, Chicago District, Chicago, Illinois. Decedent died testate, and by will dated February 3, 1972, decedent left her entire estate to her only surviving son, Robert Hillebrandt. Subsequent to filing the petition in this case, but prior to trial, Robert Hillebrandt died, on or about November 18, 1982, from injuries he sustained in an automobile accident. Subsequent to the death of Robert H. Hillebrandt, Patrick J. Nelson was appointed personal representative of decedent Emma Hillebrandt's estate on March 10, 1983, and at the time of trial, was qualified and acted in that capacity. At the date of her death, decedent was the sole owner of *45 the Hillebrandt farm, approximately 305.26 acres comprising most of the North Half (N 1/2) of Section 23, Township 9, Range 16, Buffalo County, Nebraska. The Hillebrandt farm is located approximately one and one-half miles north of the city limits of Kearney, Nebraska, and is situated on the west side of Highway 10. Highway 10 is an asphalt highway running north out of the City of Kearney. The City of Kearney is the county seat of Buffalo County and has a population of about 20,000. The nearest large town is Grand Island, located some 42 miles east of Kearney, with a population of about 30,000. The Hillebrandt farm covers an area approximately one mile from east to west and approximately one-half mile from north to south, i.e., almost a half section of land. At one time, the Hillebrandt farm included the entire northern half of Section 23 (320 acres). However, prior to decedent's death, approximately 15 acres along Highway 10 had been sold. Those 15 acres covered about two-thirds of the farm's total eastern frontage on Highway 10. That part of the Hillebrandt farm abutting Highway 10 previously sold had since been developed with residential housing and various small commercial *46 businesses. At the time of decedent's death, the Hillebrandt farm consisted of approximately 38 percent pastureland (116 acres), 46 percent dry farmland (140 acres), and 16 percent gravity irrigated farmland (49 acres). Generally, irrigated land is worth more than dry farmland (dry cropland) and dry farmland is worth more than pastureland. Both the dry cropland and irrigated land had good soil for farming purposes. The pastureland was sloped with a draw running through it. The Hillebrandt farm was accessible from three different locations. First, a county road bordered the entire western boundary of the farm, providing access from the west. Second, the eastern boundary of the farm had about 800 feet of frontage on Highway 10, and third, there was an ingress-egress road (easement) from Highway 10 running between the parcels of the Hillebrandt farm that had been previously sold off. Several buildings were located on the Hillebrandt farm. These included a house approximately 65 years old containing around 1,440 square feet, a 32 by 48 foot quonset-type building of wood structure with metal covering, and a 16 by 60 foot open-front, wood-frame building with metal covering used *47 for livestock shelter. In 1978 the development of Kearney was spreading east and west but generally to the north. The Hillebrandt farm was located in the middle of the expansion direction. A number of sales of property in the vicinity of the Hillebrandt farm occurred in 1978, generally sales of smaller parcels of land and sales for development purposes. In 1978, the Kearney area was anticipating a lot of development that ultimately did not take place; instead in 1979 and 1980 interest rates went up, the economy turned downward, and housing construction tumbled. However, in March of 1978, about a month after decedent's death, 160 acres of dry cropland and grassland located about two miles north of the Hillebrandt farm sold for $1,400 per acre (Swenson #5 and Jones #9). In November of 1978, the Holmes farm, approximately 240 acres of land situated immediately south and abutting the Hillebrandt farm was sold for $300,000 or approximately $1,250 per acre. [1] This property, the southern one-half of Section 23, was purchased solely for developmental purposes. In 1979 after about a year's delay for a country road to be built, the entire 240 acres were platted for a residential housing *48 development known as the Regency Estate Subdivision. The lots were on the market for an entire year without one inquiry. In the latter part of 1980 or the first part of 1981, this land was traded for 80 acres of land next to the country club in Kearney worth $3,500 an acre. The investors in the Regency Estate Subdivision got 80 acres worth $280,000 in the trade for 160 acres of the Holmes farm, amounting to approximately $1,750 per acre for that portion compared to the $1,250 they had paid; the record does not show how the investors disposed of the rest of the 240 acres, but due to increasing interest rates, they had an overall loss on the Holmes farm investment. The new owners of this 240-acre tract installed an irrigation well and a center pivot on the property and farmed the land thereafter. The Hillebrandt farm was subject to the zoning ordinances of the City of Kearney. At the date of decedent's death, the Hillebrandt farm was zoned agricultural, and the highest and best use of such property was agricultural. *49 On Schedule A attached to decedent's Federal estate tax return, Robert Hillebrandt reported the Hillebrandt farm as having a fair market value of $168,500. By statutory notice of deficiency dated July 28, 1981, respondent determined that the fair market value of the Hillebrandt farm at decedent's death was $457,890. In October of 1982, Robert Hillebrandt had a telephone conversation with Dennis Roper, a realtor with the Ball Real Estate Company, about liquidating all of his real estate holdings in Kearney, Nebraska. At that time, Robert Hillebrandt's holdings in Kearney included the 305-acre Hillebrandt farm and four or five other various parcels of real estate. Pursuant to this conversation, Dennis Roper prepared separate listing contracts for each of Mr. Hillebrandt's holdings, including the Hillebrandt farm, and sent them to Mr. Hillebrandt for his signature. Except for the listing contract for the Hillebrandt farm, the listing contracts each contained a listing price. The listing contract for the Hillebrandt farm, dated October 25, 1982, essentially gave Ball Real Estate the exclusive right to sell this property for a period of six months, expiring on April 25, 1983. Mr. *50 Hillebrandt signed the listing contract for the Hillebrandt farm and returned it to Mr. Roper but failed to insert a listing price in the contract. Shortly thereafter, in mid-November 1982, Robert Hillebrandt died unexpectedly in a car accident. The sole beneficiary under Robert Hillebrandt's will, dated June 17, 1980, was Shizuka Ogishima, a longtime friend of Robert Hillebrandt. The will also designated Mr. Ogishima as executor of Robert Hillebrandt's estate. Dennis Roper was informed by Shizuka Ogishima and Russ Riser, a Hillebrandt family friend, of Robert Hillebrandt's death a few days after it had occurred. Mr. Ogishima, a Japanese citizen whom Robert Hillebrandt had met some years earlier in Hong Kong, was living in San Francisco, as was Robert Hillebrandt at the time of his death. Mr. Ogishima had never lived in Kearney, but had visited the Hillebrandt farm on a few occasions as Robert's guest. The record does not indicate that Mr. Ogishima, as Robert's sole heir and executor of his estate, ever obtained any appraisal of the Hillebrandt farm or of the other properties owned by Robert at the time of his death. On November 29, 1982, Mr. Roper received a letter from *51 the attorneys representing Robert Hillebrandt's estate advising him to continue with the property listings initiated earlier. Pursuant to this letter, Mr. Roper proceeded to list the properties for sale for which he had a listing price, but a listing price for the 305-acre Hillebrandt farm had not been established, and consequently, it was not listed for sale at that time. Around the first or second week in January 1983, Mr. Ogishima, the sole heir and executor of Robert Hillebrandt's estate, agreed to a listing price for the Hillebrandt farm. Dennis Roper suggested to Mr. Ogishima that a realistic selling price for the Hillebrandt farm was in the range of $260,000 to $290,000, but Mr. Ogishima directed him to list the property at $335,000. The parties did not execute a new listing agreement but proceeded under the original listing agreement dated October 25, 1982, which had been signed by Robert Hillebrandt. Also around the first or second week of January 1983, Dennis Roper engaged the Buffalo Surveying Corporation to survey and subdivide the Hillebrandt farm into four separate parcels. The survey was conducted on January 12 and 13, 1983. The surveyor's plat indicates that *52 the largest of the four parcels is rectangular in shape and contains 256.978 acres, consisting of the entire northwest quarter of Section 23 and part of the northeast quarter of the same section. The other three parcels are considerably smaller and are located on the easternmost portion of the northeast quarter of Section 23. These three small parcels are situated from north to south, and the aggregate of their western boundaries makes up the entire eastern boundary of the 256.978-acre tract. The northernmost of these three parcels abuts Highway 10, and the other two parcels, located directly to the south, abut the western boundaries of the property previously sold along Highway 10. These three parcels situated from north to south contain 18.203, 16.636, and 15.103 acres, respectively. The Hillebrandt farm was listed in the cooperative listing that was circulated among the brokers in Kearney. The cooperative listing is a system used in the Kearney area to keep the various real estate brokers informed of property that each broker has listed for sale. In addition, the Hillebrandt farm was advertised for sale in the Kearney newspaper sometime in late January or during the month *53 of February. During the first three months of 1983, Mr. Ogishima received several offers to purchase the entire Hillebrandt farm and also received offers to purchase portions thereof, none of which he accepted. The following is a list of these initial offers: Date of Offer
Purchaser(s)
Acreage
Purchase Offer
1/21/83
Marlin & Cheryl Heiden
and Cardco Partnership[2]
Entire farm
$250,000
1/25/83
Marlin & Cheryl Heiden
and Cardco Partnership
Entire farm
270,000
1/22/83
Robert Sidner [3]
256.978 acres
200,000
1/24/83
Marlin & Cheryl Heiden
16.636 acres [4]
15,000
1/24/83
Marlin & Cheryl Heiden
18.203 acres [5]
7,000
2/21/83
Marlin & Cheryl Heiden
97.3 acres [6]
29,200
3/24/83
David Harrington
256.978 acres [7]
200,000
*54 Except for Robert Sidner, the same individuals involved with these initial offers to purchase made subsequent offers that Mr. Ogishima eventually accepted. No other offers to purchase the Hillebrandt farm were received by Mr. Ogishima from any other individuals. Mr. Ogishima finally accepted the following offers to purchase the Hillebrandt farm totaling some $267,500 as follows: Date of Offer
Purchaser(s)
Acreage
Purchase Price
2/7/83
Cardco Partnership
15.103 acres [8]
$27,500
2/7/83
Marlin & Cheryl Heiden
16,636 acres
18,000
2/7/83
Marlin & Cheryl Heiden
18.203 acres
22,000
4/20/83
David Harrington
256.978 acres
200,000
As of the date of trial, none of the above transactions had been closed. [9]
*55 As of the date of trial, the Hillebrandt farm had not physically changed since decedent's death, with the exception that a pivot irrigation system had been installed on the west half of the property. That pivot irrigation system was installed and owned by Clarence Markus who farmed the property under a lease agreement. At trial, petitioner presented the testimony and expert reports of two real estate appraisers, Rollo Wild and Jay Swensen. Mr. Wild testified to a valuation of $247,550, Mr. Swensen to a valuation of $261,746. Respondent presented the testimony and expert report of Larry Jones who testified to a valuation of $457,890, thus supporting the figure in the notice of deficiency. All three individuals are licensed real estate appraisers and qualified to give their respective opinions regarding the fair market value of real property in and around Buffalo County, Nebraska. Details in regard to these appraisals will be discussed in the Opinion below. In addition to the valuations of its two experts, the estate also relied on the 1983 sales of the four parcels of the Hillebrandt farm, described above, sales occurring five years after the valuation date. OPINION Section *56 2031(a) [10] provides that "[t]he value of the gross estate of the decedent shall be determined by including to the extent provided for in this part, the value at the time of his death of all property, real or personal, tangible or intangible, wherever situated." The only issue for decision in this case is the fair market value of the Hillebrandt farm on February 13, 1978, the date of decedent's death. Respondent's determination in the notice of deficiency as to the fair market value of the subject property is presumptively correct, and petitioner bears the burden of proving that the fair market value is lower. Welch v. Helvering,290 U.S. 111 (1933); Rule 142.
Fair market value is the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell and both having reasonable knowledge of relevant facts. Section 20.2031-1(b), Estate Tax Regs. *57 ; United States v. Cartwright,411 U.S. 546, 551 (1973); Palmer v. Commissioner,523 F.2d 1308, 1310 (8th Cir. 1975), affg. 62 T.C. 684, 696 (1974). Fair market value is a question of fact, and we are bound to consider all relevant facts and testimony in the record. Anderson v. Commissioner,250 F.2d 242, 249 (5th Cir. 1957), cert. denied 356 U.S. 950 (1958); Kaplan v. Commissioner,43 T.C. 663, 665 (1965). Both sides presented expert testimony to establish the fair market value of the Hillebrandt farm at the time of decedent's death. However, expert testimony concerning value does not have to be accepted "in toto, in part" or at all. Palmer v. Commissioner,supra,523 F.2d at 1310. As we have observed in the past, the valuation of property is an inexact science at best and, if not settled by the parties, is often capable of resolution by the courts only through "Solomon-like" pronouncements. Symington v. Commissioner, 87 T.C.     (filed Oct. 29, 1986); Buffalo Tool & Die Mfg. Co. v. Commissioner,74 T.C. 441, 452 (1980); Messing v. Commissioner,48 T.C. 502, 512 (1967). *58 This case presents the usual inexactitude of property valuations, and, as pettioner candidly admits on brief, is yet another "battle of the experts." [11]
The positions of the parties and their expert witnesses as to the fair market value *59 of the Hillebrandt farm on February 13, 1978, are as follows: Petitioner -- on brief
$254,648
Petitioner -- expert witness (Rollo Wild)
247,550
Petitioner -- expert witness (Jay Swensen)
261,746
Respondent -- Notice of Deficiency
457,890
Respondent -- expert witness (Larry Jones)
457,890
On brief, the estate contends that the fair market value of the Hillebrandt farm at the date of decedent's death was $254,648, which is simply the average of the two appraisal figures determined by its two experts. Respondent's expert valued the Hillebrandt farm at a figure some $200,000 higher than those of petitioner's experts. Unlike Solomon we cannot offer to cut the baby in half, whether we are addressing the differences between petitioner's experts or differences between those experts and respondent's; instead we must come to a reasoned decision based upon the record as a whole. In reaching such a reasoned decision, we eschew the "random walk approach, which leaves no trail" for the litigants, the bar, or an appellate court to follow. See Symington v. Commissioner,supra; Akers v. Commissioner,798 F.2d 894, 897 (6th Cir. 1986), revg. and *60 remanding a Memorandum Opinion of this Court. In our purposeful walk through the evidentiary record, we first consider the actual sales of parcels of the subject Hillebrandt farm that occurred some five years after the valuation date, and then we will consider the expert testimony. Petitioner argues that the 1983 sales of the various parcels of the Hillebrandt farm, even though occurring five years after decedent's death, are relevant in determining the fair market value of the Hillebrandt farm on February 13, 1978. We agree such evidence is relevant. Fed. R. Evid. 401. Sales occurring after the date of decedent's death are relevant and do not fall within the normal proscription against consideration of events subsequent to the valuation date. First Nat. Bank of Kenosha v. United States,763 F.2d 891 (7th Cir. 1985). Subsequent events such as discovery of oil on the property or some physical change in the property which were not reasonably foreseeable at the date of valuation cannot be considered. On the other hand sales after date of death, so long as the sale occurred within a reasonable time after death and so long as intervening *61 events have not changed the value of the property, can be considered. Here there has been no real physical change in the Hillebrandt farm (except the pivot irrigation system which was been disregarded). However, five years after date of death is a long period of time, and petitioner must make a strong showing that market conditions have not so fluctuated or changed as to dissipate the evidentiary value of the 1983 sales.Petitioner argues that market conditions in 1983 were comparable to those in 1978, and therefore the 1983 sales totalling $267,500 set some sort of ceiling on the value of the Hillebrandt farm in 1978. First, the market conditions and fair market value in 1978 are at the heart of this litigation, being hotly contested by the parties as will be discussed later. Second, the record does not establish what the market conditions were in 1983, let alone that such conditions were comparable to market conditions five years earlier. The record does not adequately established even the market trend in farm prices in the Kearney area during the five years subsequent to decedent's death. The testimony of petitioner's experts regarding the market trend in the Kearney area *62 is conflicting. Mr. Wild testified in general and conclusory terms that a drastic rise in the farm real estate market occurred from 1978 to 1981, and in the fall of 1981 farmland prices nose-dived to the level that prevailed in 1983, which he considered comparable to the 1978 values. On the other hand, Mr. Swenson testified in general and conclusory terms that any increase in farm prices occurring from 1978 to 1981 was not recognizable, but that beginning in 1981, the value of property generally depreciated on an average of 4 percent down to the 1983 levels. Neither expert furnished a single comparable or any other factual data to support his conclusion. In the presence of this conflicting and uncertain testimony, the link between sales prices in 1983 and fair market value in 1978 is too tenuous for us to accord the 1983 sales much weight. Moreover, we are not convinced that the prices contained in the four purchase agreements totaling $267,500 are necessarily indicative of farmland values in the Kearney area in 1983. While both Mr. Wild and Mr. Swenson testified in general, conclusory terms that the total purchase price of $267,500 was a reasonable reflection of the fair market *63 value of the Hillebrandt farm in 1983, the record is simply devoid of any factual data to support this testimony or to permit the Court to evaluate their conclusions. [12]
*64 In addition to the heavy reliance on the 1983 sales, petitioner presented the testimony of two real estate appraisers, Rollo Wild and Jay Swenson. As noted earlier, both are licensed real estate appraisers and qualified to give their respective opinions regarding the fair market value of real property in and around Buffalo County, Nebraska. After personally inspecting the Hillebrandt farm, Rollo Wild appraised the property and prepared a written report dated February 16, 1981, on the fair market value of the Hillebrandt farm as of February 13, 1978, the date of decedent's death. Mr. Wild used the comparable sales approach (sometimes referred to as market data approach) in determining the fair market value of the Hillebrandt farm. The market data approach is based on the commonsense approach of taking the actual sales price of the properties similar to the subject property and then relating those prices to the subject property. This Court has often used this valuation method. See Wolfsen Land & Cattle Co. v. Commissioner,72 T.C. 1, 18-21 (1979). In his appraisal report, Mr. Wild listed six allegedly comparable properties with sale dates ranging from April 21, 1977, to *65 March 7, 1979. Mr. Wild determined that the highest and best use of the Hillebrandt farm at the time of decedent's death was agricultural. In this regard, Mr. Wild generally considered irrigated farmland more valuable than dry farmland and dry farmland more valuable than pastureland. In arriving at his valuation, Mr. Wild assigned different values to the various areas of the Hillebrandt farm depending on whether such area was irrigated farmland, dry farmland, or pastureland. Mr. Wild presented the following breakdown of the Hillebrandt farm in his report in arriving at a fair market value in the amount of $247,550: 60 acres irrigated at $1,750
=
$105,000
78 acres dryland at $950
=
74,100
167 acres pasture at $350
=
58,450
Buildings
10,000
Appraised Value
$247,550
We have found serious flaws in Mr. Wild's report that detract from the reliability and accuracy of his appraisal. First of all, there are errors in the acreage for the three types of land. Using corrected acreage figures, the value is approximately $22,000 greater than depicted in Mr. Wild's report: 49 acres irrigated at $1,750
=
$ 85,750
140 acres dryland at $950
=
133,000
116 acres pasture at $350
=
40,600
Buildings
10,000
Appraised Value
$269,350
*66 The record does not indicate how Mr. Wild arrived at the value of the buildings that he listed at $10,000. Mr. Wild also did not include any specifics regarding any of the comparable properties. More importantly, however, the comparables that he listed were all located approximately 20 to 26 miles north of the Hillebrandt farm. [13] According to Mr. Wild, most of the sales around the Hillebrandt farm involving similar topographical property were smaller parcels purchased for developmental purposes. He offered no reasonable explanation, and we can think of none, for disregarding all sales in the vicinity of the Hillebrandt farm. In order to find comparable, like properties (topographical-wise) that were not purchased for developmental purposes, Mr. Wild chose to go 20 to 26 miles north of the subject property. Moreover, Mr. Wild admitted at trial that he did not use his listed comparables in determining the fair market value for either the irrigated farmland or the dry farmland, which represented some 62 percent of the land he was valuing. In fact, Mr. Wild did not list any irrigated land in his comparables. He claimed that he arrived at the values for both the irrigated and dry *67 farmland from his business experience. He testified he simply knew the "value of irrigated land, dry land, and pasture land" in the Kearney area. Mr. Wild did not give the Court the benefit of whatever comparables he was purportedly relying on, and we have no basis on which to evaluate the conclusion he reached. Without some proper underlying factual data, we are not required to accept the conclusion he reached. To accept an expert's mere ipse dixit would be an abdication of our duty as fact finder. With respect to the pastureland, Mr. Wild felt that his comparables, located 20 to 26 miles to the north, justified valuing the pastureland portion of the Hillebrandt farm at $350 per acre. He agreed, however, that land closer to Kearney was 10 to 20 percent more valuable than land some 20 to 26 miles away. [14]
*68 We find little in Mr. Wild's report that is useful in determining the fair market value of the Hillebrandt farm. The geographical remoteness of his comparables to the subject property, the fact that none of his listed comparables were actually utilized in valuing the largest percentage of the Hillebrandt farmland, and the erroneous figures used in his report regarding the acreage breakdown raise serious doubts as to Mr. Wild's thoroughness in his appraisal. Based on the foregoing, we find Mr. Wild's valuation lacking in reliability and accordingly, have accorded little weight to either his conclusory testimony or his report regarding his valuation. Petitioner's other expert, Jay Swenson, also personally inspected the Hillebrandt farm, appraised the property, and prepared a written report dated March 12, 1982, on the fair market value of such property as of February 13, 1978. Mr. Swenson used the comparable sales approach in determining land value but used the cost replacement (summation) approach in arriving at the fair market value for the buildings or structures on the property. Mr. Swenson also determined that the highest and best use of the property at decedent's death was *69 agricultural. Essentially following Mr. Wild's approach, Mr. Swenson divided the land into different categories for purposes of valuation. In addition to using irrigated farmland, dry farmland, and pastureland, Mr. Swenson determined the number of acres of roads on the property and attributed a value of zero to those acres. We are not prepared to say access roads impart no value to the other acres being valued. In any event, Mr. Swenson presented the following breakdown in his report in arriving at a fair market value in the amount of $261,746: Total Value Contributed by the Improvements: 305.26 acres at $51.99 per acre
$ 15,871
The Value of the Land: 55 acres irrigated land at $1,250 per acre
68,750
151 acres dry cropland at $900 per acre
135,900
97 acres of pastureland at $425 per acre
41,225
2.26 acres roads at $0 per acre
0
Total Value of the Land (305.26 acres at $805.46
per acre)
$245,875
Total Value (305.26 acres at $857.45 per acre)
$261,746
The per acre figure for valuing the buildings and the resulting $15,871 is nowhere explained in the record. As to the land portion, we are not persuaded that the value determined by Mr. Swenson *70 is indicative of the fair market value on February 13, 1978. Just as Mr. Wild did, Mr. Swenson also attributed acreage figures to the various portions of the Hillebrandt farm that are inconsistent with actual makeup of the property. In this instance, substituting corrected acreage figures for those used in Mr. Swenson's report results in a value approximately $10,000 less than depicted in his report, $251,460. In his report, Mr. Swenson identified the comparable sales that he used as "Index Sale No. 1" through "Index Sale No. 6." The sale dates for his comparables range from December 28, 1977, to June 7, 1978. Of his comparables, the one geographically closest to the Hillebrandt farm is No. 5, which is approximately 2 miles north and which is the same as Mr. Jones' comparable No. 9. Mr. Swenson's comparables No. 3 and No. 4 are located approximately 26 miles north and situated on either side of Highway 10; comparable No. 6 is approximately 18 miles north; comparable No. 1 is approximately 6 miles northwest; and comparable No. 2 is approximately 6 miles south and 3 miles east of the subject property. As had Mr. Wild, Mr. Swenson claimed that all the property that sold around *71 the Hillebrandt farm had developmental potential, which had an influence on the value of those sales. Again, as in the case of Mr. Wild, we do not understand how he could completely ignore those sales in the vicinity of the Hillebrandt farm. Mr. Swenson claimed he looked for ideal property to compare with the subject property. He felt that using comparable sales located farther away would show a more realistic picture of the value of comparable farmland. However, the record indicates that Mr. Swenson also did not rely entirely on his comparables in determining the value of the Hillebrandt farm. Mr. Swenson claimed that he had access to acres and acres of land sales, and he used some of these sales to arrive at an average sales price for the subject property. It is apparent that Mr. Swenson considered these undisclosed sales as comparables in making his appraisal. It is not apparent why Mr. Swenson chose not to include these undisclosed sales in his list of comparables. In any event, his reliance on undisclosed sales that are not part of the Court's record not only undermines the Court's confidence in his report but makes it impossible for the Court to evaluate the conclusions he *72 reached in his report or in his oral testimony. With one exception, it is difficult to find any nexus between the alleged comparables listed in his report and the value he attributed to the Hillebrandt farm. Mr. Swenson attributed a $1,250 per acre value to the irrigated portion of the Hillebrandt farm. His comparable No. 2 reflects that 80 acres of irrigated land located in Kearney County about 6 miles south of the Hillebrandt farm sold for $1,250 an acre on June 7, 1978. For all these reasons, we are not persuaded that Mr. Swenson's valuation is a reasonable approximation of the fair market value of the Hillebrandt farm at the time of decedent's death, except perhaps for the irrigated land. While we are not persuaded by either of petitioner's experts, we are also unable to wholly accept the value of respondent's expert as the fair market value of the Hillebrandt farm on February 13, 1978. Respondent presented the testimony of Larry Jones, who is a licensed real estate appraiser and qualified to give his opinion as to the fair market value of the subject property. Mr. Jones appraised the Hillebrandt farm and prepared a report dated May 19, 1980, on the fair market value of the *73 subject property as of February 13, 1978. Mr. Jones also used the comparable sales approach in making his determination. In his report, Mr. Jones identified his comparable sales as "Index Sale #1" through "Index Sale #14." The sale dates of his comparables range from June of 1977 through January of 1980. Not all of these properties are comparable. Mr. Jones essentially listed virtually every sale within a three to four mile radius of the Hillebrandt farm in that time frame. As had both of petitioner's experts, Mr. Jones determined that the highest and best use of the Hillebrandt farm at the date of decedent's death was agricultural. However, Mr. Jones indicated that the Hillebrandt farm, although zoned agricultural, was subject to "urban influence," which essentially meant buyers were willing to pay higher prices for land located closer into Kearney. While urban influence may be a somewhat indefinable concept, location is always an important factor in valuing real estate. Actual sales in the vicinity of the Hillebrandt farm cannot be ignored even if those sales were for development purposes. Proximity to land being sold for development, whether labeled "urban influence" or the *74 realtor's talismanic "location, location, location," impacts on the value of the Hillebrandt farm and cannot be completely disregarded, as petitioner's experts chose to do.On the other hand, Mr. Jones overemphasized urban influence by concentrating on sales of smaller tracts of land and ignoring the sale of the farm most comparable in size, geographical proximity, and date of sale, the sale of the Holmes farm which we will discuss below. In addition, Mr. Jones did not assign separate values with respect to irrigated farmland, dry farmland, or pastureland. Rather, Mr. Jones categorized the Hillebrandt farm as a combination farm and arrived at a figure per acre by comparing whole farms with whole farms. Mr. Jones assigned no separate value to any buildings and used a per acre sales figure without any adjustments for the size of the particular tract or for the type of land (irrigated, dry cropland, or pasture). Mr. Jones determined that the fair market value of a combination farm at the date of decedent's death was $1,500 per acre and accordingly, assigned a fair market value to the Hillebrandt farm in the amount of $457,890 (305.26 acres X $1,500 per acre). Without further discussing *75 each and every aspect of Mr. Jones' report, which in our opinion would serve no useful purpose, suffice it to say, we think respondent's expert using $1,500 per acre overvalued the Hillebrandt farm at $457,890. Cf. Penn v. Commissioner,219 F.2d 18, 21 (9th Cir. 1955); Messing v. Commissioner,48 T.C. 502, 512 (1967). In this connection we find the sale of the Holmes farm, the southern half of Section 23 contiguous to the Hillebrandt farm, most relevant. While we have rejected petitioner's efforts to set the combined 1983 sales figure ($267,500) as a ceiling for the 1978 valuation, we think the sale of the Holmes farm could properly serve to set an outer limit. The Holmes farm, being closer to Kearney and theoretically even more subject to urban influence than the Hillebrandt farm, sold for development purposes for only $1,250 per acre in November of 1978, just nine months after decedent's death. While the planned development of the Holmes farm ultimately proved unsuccessful after that farm was subdivided and put on the market in 1979, that sale shows a market for large tracts (240 acres) of farmland near Kearney in 1978. That the real estate *76 development bubble burst thereafter does not justify our ignoring the Holmes farm sale, as all three of the experts did. [15] At the same time, that November 1978 sale of farmland for development purposes should set a ceiling on any valuation of the Hillebrandt farm of $381,575 (305.26 acres X $1,250 per acre). [16]
*77 With the outermost limit at $381,575, there is quite a range of valuation figures in the record. Mr. Wild's valuation (with corrected acreage figures) is $269,350, but he agreed that land closer to Kearney could be 10 to 20 percent higher, which would be $296,285 to $323,220. Mr. Swenson's valuation (with corrected acreage figures) is $251,460. To thread a path through this maze and to avoid the shares of the "random walk approach, which leaves no trail" ( Akers v. Commissioner,supra), we will spell out the basis for our determination of fair market value. Respondent's expert did not come up with any figure for the improvements or buildings on the farm; petitioner's experts used $10,000 and $15,871 without any explanation of the basis therefor. We will use the $15,871 for improvements or buildings for lack of anything better. Mr. Wild used $1,750 per acre for irrigated farmland and Mr. Swenson used $1,250 based on a sale (No. 2) on June 7, 1978, in Kearney County, six miles south of the Hillebrandt farm. Mr. Jones had no dollar value for specific land types, but the comparables he furnished will support a figure of $1,400 to $1,500 per acre. His comparable *78 No. 9 (same as Mr. Swenson's No. 5) shows a sale in March of 1978 of 160 acres of dryland two miles north of the Hillebrandt farm at $1,400 per acre, a figure that could be increased for irrigated land and for a location closer to Kearney. Therefore, we conclude that the irrigated land had a value of $73,500 (49 acres X $1,500). For dry cropland, Mr. Wild used $950 per acre and Mr. Swenson $900. Those figures are either derived from undisclosed "comparables" or from properties located too far from Kearney to be treated as comparable. Here we think the $1,250 per acre for the southern half of Section 23 is a reasonable value, for a total of $175,000 (140 acres X $1,250). Lastly, for the pastureland, Mr. Wild used $350 per acre and Mr. Swenson used $425 per acre, again with both experts going up to 26 miles away from Kearney for their "comparables." Mr. Wild agreed the figure would be 10 to 20 percent higher close to town where the Hillebrandt farm was located, thus presumably $385 to $420 would be reasonable according to him. Mr. Jones' comparables for pastureland (Nos. 3, 4, and 5) showed sales to support his $1,350 for pastureland, but he disregarded the size of the tracts and *79 the fact that two of them were sold for development purposes. We accept Mr. Swenson's figure of $425, but in view of the $1,250 sales price for the large tract of land just south of the Hillebrandt farm and to give some recognition to location or urban influence, we increase the per acre figure to $500. Thus we find a value of $58,000 for the pastureland (116 acres X $500). In summary, this results in the following: $ 15,871
buildings
73,500
irrigated land
175,000
dry cropland
58,000
pastureland
$322.371
This figure of $322,371 amounts to approximately $1,056 per acre for the farm as a whole, which we conclude was the fair market value of the Hillebrandt farm on the date of decedent's death. The reflect the parties' stipulations and our holding, Decision will be entered under Rule 155.
Footnotes
1. The 240 acres were purchased by investors in two parcels -- some 33 acres at $1,000 an acre and 207 acres for $267,000 or approximately $1,290 per acre.↩
2. Marlin Heiden is a contractor in the Kearney area involved primarily with residential and small and light commercial construction. Mr. Heiden lives on the east side of the Hillebrandt property, having resided there for about 22 years. This property, which he purchased years ago from Mr. Hillebrandt (decedent's husband), has approximately 340 feet to Highway 10 frontage. Cardco is an investment partnership with two partners, Dwayne Sohrweid and his brother-in-law, Alan Zumbrunnen. Mr. Sohrweid and Mr. Zumbrunnen also operate a construction business under the name Nebraska Irrigation Engineering. They own the property south of the southwest corner of the Hillebrandt farm. ↩
3. Robert Sidner is a doctor in the Kearney area. Mr. Sidner offered to purchase the 256.978-acre parcel as depicted on the plat map pursuant to the survey of January 12 and 13, 1983. ↩
4. This 16.636-acre parcel is contiguous to the west of Mr. Heiden's property that is situated along Highway 10. ↩
5. This parcel of land, consisting of approximately 18.203 acres, abuts the 16.636-acre parcel to the north. The eastern boundary of this parcel is adjacent to Highway 10 with approximately 786 feet of highway frontage. The western boundary of this parcel coincides with the western boundary of the 16.636-acre parcel situated directly to the south. ↩
6. This 97.3-acre parcel is part of the 256.978-acre tract as depicted on the plat map and consists of the western 1,600 feet of the northeast quarter of Section 23. ↩
7. This is the same tract that Robert Sidner had previously made an offer to purchase on January 22, 1983. Mr. Harrington is Skiles, an associate broker with Realty World in Kearney, Nebraska. Mr. Harrington is a personal friend of Mr. Skiles and also a partner with and a personal friend of Mr. Skile's brother. Mr. Skiles contacted Mr. Harrington concerning the tract of land for sale. Mr. Skiles first learned of the property listing in late February or early March of 1983 from his broker, Perry Dawes.↩
8. This 15.103-acre parcel is located in the southeast portion of the Hillebrandt farm. The parcel does not have Highway 10 frontage but it does have ingress and egress to Highway 10. It is situated to the west of the Riverview subdivison which fronts Highway 10. The western boundary of this parcel coincides with the western boundaries of the two other parcels situated directly to the north. The Cardco partnership or members thereof own the property just south of this 15.103-acre parcel. ↩
9. While these transactions had not been concluded by the time of trial, we treat them as completed sales for purposes of this case. In view of our disposition of the case, we need not address respondent's various attacks on the validity of these transactions.↩
10. Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954, as amended and in effect during the taxable year in question, and all "Rule" references are to the Tax Court Rules of Practice and Procedure.↩
11. While all three appraisers were qualified to give their opinions as to the date of death valuation, Mr. Jones' written report was far more comprehensive and carefully prepared than those of the other two appraisers. Mr. Jones has testified on behalf of the Internal Revenue Service on numerous occasions in various types of valuation cases. During 1980, when he prepared his report in this case, approximately 25 percent of his appraisal work was for the Internal Revenue Service. As we have had occasion to note in other valuation cases: In the present case, as in the ordinary case, any doubts about the reliability of an expert's testimony are based on the failure of the facts to support his assumptions and his ultimate opinion rather than any doubt as to whether the expert is expressing a truthful opinion. Estate of Fittl v. Commissioner,T.C. Memo. 1986-452, 52 T.C.M. 567↩, 571, 55 P-H Memo T.C. par. 86,452 at    .
12. Petitioner did not produce evidence of one farm sale in 1983 in the Kearney area to show that the sales prices contained in the four purchase agreements were realistic. In fact, the only evidence in the record seems to be to the contrary. About the time of the 1983 sales, property located immediately north of the Hillebrandt farm was listed for sale with Realty World in Kearney for about three or four months. The property consisted of 23.5 acres, with approximately one-quarter mile of frontage along Highway 10. The property abutted the northeast corner of the Hillebrandt farm and was listed for $80,000 ($3,400, per acre rounded off). While we cannot determine whether this is representative of the sales in that area in that time period, we also cannot determine that it was not. The record is also deficient in another respect. The record does not establish that the 1983 sales were sales between a reasonably informed seller and buyers. The record is devoid of any evidence as to the educational background, business experience, or financial situation of Mr. Ogishima, Robert Hillebrandt's sole heir and the executor of his estate, at the time of the 1983 sales. While Mr. Roper, the broker, testified that Mr. Ogishima was under no compulsion to sell, this appears to be sheer speculation, since he had not even met Mr. Ogishima until after the 1983 sales agreements were signed. Similarly, the testimony of two of the buyers and another broker to the effect that Mr. Ogishima was under no compulsion to sell was also speculation. None of these witnesses presented any factual basis for his conclusion, and Mr. Ogishima did not testify at the trial. The record does show that Mr. Ogishima had only seen the farm when he visited there as a guest of Mr. Hillebrandt in earlier years. The record does not show that Mr. Ogishima obtained any independent appraisal before signing the contracts produced by Mr. Roper.↩
13. His report as originally submitted did not contain the list of comparable sales that he used in making his determination. The list of six comparables was submitted and attached to his report approximately 30 days prior to trial. Mr. Wild admitted at trial that his comparable listed as number 2 was the same comparable listed as number 5, reducing his list of comparables to five. ↩
14. Mr. Wild testified that property close to Kearney has approximately a 10 to 20 percent higher value than comparable property located 20 to 26 miles north of Kearney, but his testimony and his report do not indicate that he made any such adjustment even with respect to the pastureland he was valuing.↩
15. None of the experts relied on this sale. Neither of petitioner's experts used this sale as a comparable because the property was purchased to develop rather than to farm. Respondent's expert did not include this sale as a comparable because he questioned whether the sale was an arms-length transaction. However, several weeks before trial, at respondent's request, Mr. Jones looked further into this sale and decided that it was indeed an arms-length transaction. We are also convinced that this 240-acre sale was an arms-length transaction. ↩
16. Respondent argues that the sales price of this 240-acre tract at $1,250 per acre for developmental purposes somehow supports the valuation of the Hillebrandt farm at $1,500 per acre for farm purposes. We didsagree. Respondent contends that the 240-acre tract contained no irrigated land or highway frontage, contained more pastureland, had inferior soils, and was not as level as the Hillebrandt farm. After adjustments for these differences are taken into account, respondent submits that $1,500 per acre is entirely reasonable. We think respondent's comparisons are misplaced. As Mr. Swenson points out, the topographical layout of property that is purchased for developmental purposes is somewhat less significant than property that is purchased to farm. Since the 240-acre tract was purchased to develop a residential subdivision, whether or not the property was irrigated and quality of soils are less important. More importantly, respondent seems to ignore the fact that land for development purposes has a higher value generally than farmland. There is no basis for taking higher valued development land and ratcheting the value upward for the better topography and soil types that might be desirable for lower valued farmland. Also respondent's expert simply ignored soil types in his "whole farm" valuation approach. While respondent wants to use urban influence to ratchet upward the value of the Hillebrandt farm as a farm, we are satisfied that the sale of the southern half of Section 23 at $1,250 per acre for development purposes simply caps any valuation of the northern half of Section 23 (the Hillebrandt farm) for agricultural purposes.↩