**J. Clark AKERS, III, Eleanor M. Akers, William B. Akers, and Jo Ann Akers, Petitioners-Appellants,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Respondent-Appellee.**

Nos. 84–1838 to 84–1840, 84–1842, 84–1844, 84–1845, 84–1881 and 84–1883 to 84–1885.

United States Court of Appeals, Sixth Circuit.

Argued March 3, 1986.

Decided Aug. 20, 1986.

Mark H. Westlake, argued, Tune, Entrekin & White, Nashville, Tenn., for petitioners-appellants.

Michael J. Roach, argued, Fred T. Goldberg, Jr., Chief Counsel, Washington, D.C., Glenn L. Archer, Jr., Michael L. Paup, Asst. Atty. Gen., Dept. of Justice, Tax Div., Washington, D.C., Ann Belanger Durney, for respondent-appellee.

Before: JONES and NELSON, Circuit Judges, and EDWARDS, Senior Circuit Judge.

DAVID A. NELSON, Circuit Judge.

The question presented in these consolidated appeals is whether the Tax Court erred in its determination of the fair market value of certain wastewater treatment equipment donated to Vanderbilt University by William B. Akers and his brother, J. Clark Akers, III. In a memorandum opinion reported at ¶ 84,207 P–H Memo TC (1984),[1] the Tax Court held that the equip-

---

**1.** The opinion also addressed a number of other questions, some of which furnished grist that we have ground elsewhere. See *Asphalt Products Co., Inc. v. Commissioner of Internal Revenue*, 796 F.2d 843 (6th Cir.1986), upholding the Tax Court on the question whether a corporation controlled by the Akers family had to change accounting methods but disagreeing with the Tax Court's treatment of a negligence penalty imposed because of the mishandling of the cost of transporting the wastewater treatment equipment involved in the case at bar, and *Estate of James C. Akers v. Commissioner of Internal Revenue*, 798 F.2d 469, an unpublished decision filed by this court on June 13, 1986, where we reversed the Tax Court's decision insofar as it held that the corporation's bargain rent-

ment had a fair market value of $75,000. We consider the Tax Court's valuation clearly erroneous.

## I

The equipment in question consists of two "pilot" wastewater treatment plants mounted on conventional flatbed trailers and accompanied by two crates (weighing 9,000 pounds) of spare pumps, pipes, laboratory equipment, etc. The plants were built in the early 1970's for use in experimenting with different types of biological and chemical wastewater treatment processes.

It was stipulated that the original owner of the plants, a California corporation, paid third-party materialmen and fabricators approximately $165,000 for building and refurbishing the plants in 1972–73. That figure includes neither the cost of the trailers nor the owner's engineering, design and overhead costs. The equipment had a useful life variously estimated at four to twelve years or more, and it was actually used by the California corporation on three experimental projects that ran for a total of approximately eight months.

The original owner experienced financial difficulties, and a lender that held a security interest in the equipment took physical possession of it and offered it for sale through a form letter distributed mainly to equipment manufacturers. (The Tax Court found that environmental engineering consulting firms and research institutions, which were not circularized, would have been more likely to have an interest in such equipment.) The solicitation for bids contained a representation that the California corporation had sunk more than $300,000 into the equipment.

Dr. John Roth, a professor of environmental engineering at Vanderbilt University, learned the equipment was for sale and mentioned it to Mr. William Akers, the fundraising chairman for Vanderbilt's engineering school. Vanderbilt had a potential use for the plants, but did not have the funds to buy them.

Having been told that the founder of the California corporation was bidding $15,000 for the equipment on his own account, and having secured the agreement of his brother to go halves with him on a slightly higher bid, Mr. Akers put in a bid of $17,500. The Akers knew that great bargains are sometimes to be had at distress sales such as this one, and while they knew little more about these wastewater treatment plants than that they contained a lot of complex equipment and had allegedly cost over $300,000, the Akers believed (correctly, in the judgment of the Tax Court) that the plants would be a bargain at $17,500.

Only two bids were received, and the Akers', being higher, was accepted. The Akers took title on July 17, 1984, and had one of their companies bring the plants to Tennessee. The plants were not in operating condition at that time. After discussions with both Vanderbilt and the Nashville Metropolitan Government ("Metro"), the Akers allowed Metro to use the equipment for design studies on a major expansion of Metro's own wastewater treatment facilities. At its own cost, Metro made the plants operational.

At the end of 1975, Metro having finished its design studies, the Akers conveyed the plants (including the trailers on which they were mounted and the two crates of spare parts and related paraphernalia) to Vanderbilt University. The record suggests that the Akers may have intended

al and sale of a house to the father of William and Clark Akers should have been treated as additional compensation to the senior Mr. Akers. The Commissioner has taken a protective appeal with respect to the issue addressed in the latter case, asking us to hold here that the value of the bargain rental and sale should be taxed as a constructive dividend to William and Clark Akers if we should hold that it is not to be treated

as compensation paid to their father. In case No. 84–1843 we asked the Tax Court to take another look at the compensation question, and it is therefore appropriate that we ask the Tax Court to take another look at the constructive dividend question if it changes its mind on the compensation issue. We make that request here.

to do this all along, but the Tax Court declined to find that the Akers had acted as Vanderbilt's agent in the purchase of the plants or that the Akers were compelled to convey the plants to Vanderbilt. The government has not appealed this finding.

Shortly before it took title to the pilot plants, Vanderbilt had them appraised by two well qualified professional engineers. The first, Mr. Gerry Shell, examined the equipment at the Metro facility, found it to be in good operating condition, and estimated its "cost," based on its "present conditions [sic] ... and replacement cost," to be $184,861. It does not appear that the value of the two crates of spare parts was included in that figure. The second appraisal was provided by Col. William F. Brandes, Director of the Water Resources Research Center at the University of Tennessee. Col. Brandes, who also examined the units at the Metro sewage treatment plant, undertook to put a value on the plants "as they were before being transported to Tennessee last year." Using a cost approach, Col. Brandes estimated the total value, as of mid–1974, at $210,510. This figure included the value of the two crates of spare parts, which Col. Brandes put at $46,000. Col. Brandes determined that on the basis of its rental value the equipment had a present worth of approximately $225,000. Recognizing that the "latter approach is more subjective," but believing that "it affords a reasonable check on the first method," Col. Brandes concluded his report with the opinion "that the price at which the property would change hands between a willing buyer and a willing seller, both having reasonable knowledge of the relevant facts, would be $210,000."

The equipment was also examined at the Metro plant in December of 1980 by Dr. John Koon, who holds a Ph.D. in sanitary engineering from the University of California at Berkeley. Dr. Koon was retained by the Akers, and in a valuation report submitted to their attorney in May of 1981, Dr. Koon opined that the equipment (exclusive of the two crates of spare parts, which were not available for his inspection) had been worth at least $130,290 on site in California in April of 1974. He expressed the opinion that the equipment "had a very great value in 1975 to environmental engineering laboratories and research centers ... [and others] engaged in treatment system testing and evaluation, and industries and municipalities which had the need to conduct pilot-scale treatment investigations." Dr. Koon estimated the replacement cost of the equipment (exclusive of the two crates) at $243,155 as of May 1, 1981. Professor Roth, of Vanderbilt, testified that the university used the equipment donated by the Akers in a biological wastewater treatment study on the strength of which Vanderbilt obtained a federal grant from the Environmental Protection Agency. Professor Roth doubted that Vanderbilt would have received the grant without the donated equipment, or equivalent equipment. Dr. Koon testified that research activity in the wastewater treatment field was at its height in 1974–75, because the Clean Water Act required municipalities and industries to have defined levels of wastewater treatment in place by 1977.

The Akers brothers and their wives claimed charitable deductions on their 1975 federal income tax returns reflecting a fair market value of $201,000 for the equipment at the time of its donation. Unwilling to accept this valuation, the Commissioner had one of its staff engineers, Steven A. Wilgus, examine the plants in January of 1982 with a view to estimating their worth. Mr. Wilgus, who had no experience with pilot wastewater treatment plants, concluded that the fair market value of the plants was $20,500. This figure was based on the fact that the Akers had been able to buy the plants for $17,500 and on an attempt to capitalize the income stream that Mr. Wilgus assumed could be realized from renting the equipment. He admitted that he knew of no one who rented this kind of equipment for profit, and he ignored the unique value of the plants as a research tool. Mr. Wilgus also ignored Metro's rehabilitation of the plants, his appraisal purportedly representing their value in California before Metro had made them operational again. The Tax Court found "various

weaknesses" in the method of valuation used by Mr. Wilgus, and noted that he lacked the experience of the other experts. The Tax Court also found fault with the appraisals of the other experts, however, primarily because of their failure to account for physical wear and tear.

After discussing the testimony of all the experts, but without having attempted to quantify any adjustments that might have been appropriate in their valuation figures, the Tax Court made what it described, in a footnote, as a "Solomonlike pronouncement":

"After considering all the facts presented in the record in this case, we conclude that the fair market value of the plants at the time they were donated to Vanderbilt University was $75,000. Accordingly, we hold that the total amount of charitable contribution is $75,000." ¶ 84,208 P–H Memo TC at 84–789.

## II

We are entitled to set aside the Tax Court's factual findings as to fair market value only if we find them clearly erroneous. *Estate of Kaplin v. Commissioner of Internal Revenue*, 748 F.2d 1109, 1110 (6th Cir.1984). This standard of review requires that "we accord great deference to the values established by the Tax Court," but "it does not render us a mere rubber stamp." *Miami Valley Broadcasting Corp. v. Commissioner of Internal Revenue*, 594 F.2d 556, 557 (6th Cir.1979). If we are to perform our limited review function intelligently, "[a]t the very least, we must be told the method of valuation that the Tax Court employed to arrive at its figures." *Id.* Where the Tax Court fails to explain how it arrived at its conclusion on valuation, we have not hesitated either to send the case back or to correct the Tax Court's numbers if the ensuing explanation fails to pass muster. See the order in *Miami Valley Broadcasting* reported at 661 F.2d 582 (6th Cir.1981), directing the Tax Court to change the discount rate it used valuing a leasehold interest from 17% to 11%.

The Tax Court's opinion in the case at bar offers no explanation of the process through which the court arrived at its $75,000 valuation figure. Unlike the original judgment of Solomon, the true rationale of which has been readily apparent to generations of disinterested observers—if not, at first blush, to both of the maternal litigants—the judgment appealed from here has no discernible logic. We are not prepared to permit the Tax Court, whenever it disagrees with the valuations offered by both sides, simply to shut its eyes and pick at random any number that happens to lie somewhere between the Commissioner's valuation and the taxpayer's. Only by happenstance will such a blind choice avoid a valuation that is either unacceptably low or unacceptably high. The random walk approach, which leaves no trail for the appellate court to follow, may be a sensible way to pick stocks, but it is not an appropriate way to determine the value of a charitable donation.

The decision of the Tax Court is REVERSED, and the cause is REMANDED for revaluation of the donated equipment, and, if necessary, reconsideration of the constructive dividend issue referred to in the footnote at the beginning of this opinion.