C. BENSON BRANCH and ANITA BRANCH, ET AL., [1] Petitioners, v. COMMISSIONER OF INTERNAL REVENUE, Respondent Branch v. Commissioner
Docket Nos. 10707-84, 10939-84, 10940-84.
United States Tax Court
T.C. Memo 1987-321; 1987 Tax Ct. Memo LEXIS 321; 53 T.C.M. (CCH) 1261; T.C.M. (RIA) 87321; June 25, 1987. Wallace M. Wright and James A Kendall, for the petitioners. Chauncey W. Tuttle and David W. Elston, for the respondent. CLAPP
MEMORANDUM FINDINGS OF FACT AND OPINION CLAPP, Judge: Respondent determined the following deficiencies in petitioners' Federal income taxes by notices of deficiency: Docket No.
Year
Deficiency
10707-84
1976
$31,489.00
1977
41,046.00
1978
80,821.00
10939-84
1977
1,580.00
1978
96,636.00
10940-84
1977
141,157.10
1978
112,140.00
By amendment to his answers, respondent determined increased deficiencies with respect to petitioners' Federal income taxes for some of the years in issue. Thereafter, petitioners amended their petitions to claim overpayments with respect to some of the years in issue. The deficiencies *322 determined by respondent in his amended answers and the overpayments claimed by petitioners in their amended petitions are as follows: Docket No.
Year
Deficiency
Overpayment
10707-84
1976
$101,714.00
$38,835.00
1977
41,046.00
1978
80,821.00
9,125.00
10939-84
1977
75,261.00
1978
104,737.00
10940-84
1977
178,009.63
1978
112,140.00
25,366.00
The only issues in these cases relate to the fair market values of parcels of land located on the island of St. John, one of the U.S.Virgin Islands. The donations in issue consist of approximately 132 acres given to the Nature Conservancy, Inc., in 1976 and one acre given to the United States in 1977. The deductions in issue in 1978 and some of those in issue in 1977 are carryovers of excess contributions resulting from the donations made in 1976. FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts and attached exhibits are incorporated herein by this reference. Petitioners C. Benson Branch (Branch) and Anita Branch resided in Spain at the time of the filing of their petition herein. Petitioners Herbert D. Doan (Doan) and Anna J. Doan *323 and petitioners Carl A. Gerstacker (Gertstacker) and Esther S. Gerstacker resided in the State of Michigan at the time of the filing of their petitions herein. On September 19, 1969, Branch, Doan, and Gerstacker, together with Shailer L. Bass (Bass), organized and became equal partners in a partnership known as Four Estates of St. John, Inc. (Four Estates), a Michigan partnership. Their purpose was to acquire lands known as Estate Bellevue, Estate Beverhoudtsberg, and Estate Rendezvous and Dittlief on St. John, one of the U.S.Virgin Islands, and to develop those lands for sale. The U.S.Virgin Islands lie at the northern end of the Lesser Antilles, the island chain which separates the Caribbean Sea from the Atlantic Ocean. The territory includes more than 50 islands and cays, but only three are large enough to be of economic and political importance: St. Croix with 80 square miles, St. Thomas with 32 square miles; and St. John with 20 square miles. St. John is located three miles east of St. Thomas, the territorial capital, and 60 miles southeast of San Juan, Puerto Rico. The island is approximately nine miles long and, at its widest point, five miles across. The topography *324 of the island consists of meager flatlands and predominantly steep slopes and mountains. The highest elevation on the island is 1,277 feet above sea level. The temperature on the island ranges from 70 to 90 degrees year around, with an average temperature of 82 degrees. The higher elevations are generally cooler. The average rainfall is approximately 45 inches per year. The U.S.Virgin Islands are under the jurisdiction of the Department of the Interior, in accordance with their territorial status. In the 1950's the population of St. John was only about 700. The population of St. John has, over time, increased due to the influx of persons from the U.S. mainland, many of whom have retired to the island. The population includes others who are part-time, seasonal residents. In 1976, the U.S.Virgin Islands Planning Office estimated the population of the island at 2,327 persons. Cruz Bay is the only town on St. John, primarily because of its small but good harbor with access to regular ferry and barge service to St. Thomas. Approximately 80 percent of the residents of Cruz Bay are indigenous Virgin Islanders, the remaining being from the U.S. mainland. Cruz Bay has a number *325 of small general stores, a post office, a small health clinic, and scattered government offices. Homes are constructed very close together, with the average house plot being from 2,500 to 5,000 square feet. The general style of residential development is a one and two story concrete block structure of simple design. Utilities on St. John are substandard as compared with U.S. mainland standards. Electricity reaches almost all residences, but interruptions in service have been common. Despite the 45 inches of annual average rainfall, an adequate fresh water supply can be a problem in some areas since there is limited subsurface water. Municipal water lines do not reach outside of Cruz Bay. Most water is supplied by roof and hillside catchments, and all structures are required to have cisterns, sized in accordance with their roof area and proposed use. When additional water is needed during dry periods, it is brought to the island by barge and then trucked to users by contract. Most sewage is handled by septic systems. Telephone communications in the Virgin Islands have traditionally been poor. Land use on St. John reflects (i) historically conditioned patterns of individual *326 native family holdings, (ii) an elaborate private and public sector preservation strategy dating back to the early 1950's, and (iii) low density, high priced, single family development. St. John is the least developed of the three major U.S.Virgin Islands. Most residential development is located within and around the two commercial areas of Cruz Bay in the west and the village of Coral Bay in the east. In both communities, infrastructure development has been slow and lags behind the sister island of St. Thomas. The balance of the population is relatively scattered throughout the rest of the island. There is very little agriculture activity on St. John. Factors such as very steep slopes and small amounts of open space have barred the development of agriculture on any significant scale. Only nine acres of the land area is pasture land for goats and cattle. Commercial land use is also very limited. St. John has no industry or manufacturing and the island's economy is tied directly to that of St. Thomas. Most major shopping for basic necessities, such as food and clothing, is done on St. Thomas. While there are a few small shops on St. John, commercial land use occupies only *327 38.7 acres of all land on St. John. Three-fourths of this is resort commercial land use, of which Caneel Bay comprises a major portion. Climate and natural features have combined to make St. John a very popular tourist attraction, although tourism is relatively low-key. The island primarily caters to visitors to the National Park and the clientele of the resort complex located at Caneel Bay Plantation, operated by Rockresorts, Inc. With the exception of a limited number of additional guest houses and a few residential areas, the majority of the island remains in a relatively pristine, undeveloped condition. A large part of St. John, 55.2 percent (6,968 acres), is under the supervision of the National Park Service. On August 2, 1956, Federal legislation authorized the creation of the Virgin Islands National Park when at least 5,000 acres had been acquired for such purpose. The legislation authorized the acquisition of not more than 9,485 acres on or around the island of St. John and 15 acres on the island of St. Thomas. In 1956, 4,665.73 acres on the island of St. John were contributed by Jackson Hole Preserve, Inc. (JHPI) to the National Park. At the same time, Caneel Bay *328 Plantation, Inc., contributed 420.68 acres. In 1968 Congress expanded the boundaries of the National Park to include offshore waters. Land acquisition for the National Park directly competes with private purchasers within the National Park boundaries. By a deed executed on September 22, 1969, Gerstacker, Doan, Bass, and Branch, the equal partners in Four Estates, purchased 452.98 acres on St. John from JHPI for the sum of $855,600. The purchased land consisted of certain "estates:" the Estate Rendezvous and Dittlief (178.7 acres); the Estate Bellevue (100.76 acres); and the Estate Beverhoudtsberg (173.52 acres). The purchase of the 452.98 acres from JHPI made Four Estates the largest private landowner on St. John. The deed contained the following restrictions: 2. The premises conveyed under this Deed shall be used exclusively for residential purposes and, except as provided below, the premises shall be improved and occupied only by single family private residences and structures normally appurtenant thereto, such as a garage, guest house, green house, toolshed, and space to be occupied by a caretaker or servants. No part of any residence shall exceed two stories in height, *329 inclusive of attics on said residence's uphill side. Each story of said residences shall not exceed ten feet in height. The average number of such single family residences that may be constructed per acre of the premises shall not exceed one, and no more than four of said residences may be constructed until the Grantee has filed with the Grantor a recordable development plan for the other residences to be constructed, said plan to show the number of plots in the proposed subdivision, and the location of roads. The Grantee shall also file with the Grantor the Grantee's own proposed restrictions to ensure that such residences will blend suitably with the surrounding landscape, that they will be appropriately spaced within the plot boundaries and that said height restrictions will be observed. No construction pursuant to said development plan shall be commenced until said plan is approved in writing by the Grantor. After such approval, said development plan may not thereafter be modified, amended or withdrawn without the prior written approval of the Grantor which the Grantor will not unreasonably withhold. It is understood that if no response is received by the Grantee within sixty *330 (60) days from date of submittal to the Grantor of said plans, the same shall be considered as accepted by the Grantor and the Grantee may proceed in full reliance thereon. 3. The Grantor recognizes that: (a) the premises herein conveyed are isolated, difficult of access and unlikely to become a part of the incorporated village of Cruz Bay; (b) the premises are sufficiently large that two self-contained residential communities are possible; and (c) it would be desirable to have in each a service center that could provide the services essential to such a community. Therefore, the Grantor accepts that the development plans for (i) Estate Rendezvous and Dittlief and (ii) Estates Bellevue and Beverhoutsberg may each include: (1) one central clubhouse, with recreation, restaurant and temporary accommodations for guests of the residents; (2) a property management and service center, for the protection, maintenance and service to the residences and properties; and (3) a medical and personal health service building. The development plans for Estate Rendezvous and Dittlief shall further show any proposed improvements to the shoreline, including docks, breakwaters, and navigation aids. *331 Otherwise, the Grantee will not at any time use or permit to be used any other building erected on the premises as a hotel, boarding or lodging house, or apartment house. Nothing herein, however, shall prevent the leasing of an entire single family residence to be used solely as a single family dwelling. Said clubhouse and management service center structures shall be subject to the same height restrictions and prior approvals as to blending with the terrain as those for residences in Paragraph No. 2 above. Other than the services above provided to the occupants of the residences and their guests, the Grantee will not allow any trade, industry or business to be practiced, permitted, or carried on the premises, except that there shall be permitted an area of adequate size in each of two areas envisaged in this Paragraph No. 3 in which construction supplies, materials, equipment and the like may be stored, assembled and dealt with in connection with the construction and maintenance of land, buildings and facilities in that area. Such areas shall be maintained in a sanitary condition and operated in a workmanlike manner. The appearance of such areas shall blend suitably with the *332 surrounding landscape. The restrictions placed in the deed of sale to Four Estates ran with the land and were restrictions on any person taking any portion of the property from or through Four Estates. Bass became a full-time resident of St. John in the early 1970's. During the years in issue, he acted as manager of the affairs of Four Estates. Although they initially purchased the land for development, the partners of Four Estates decided that they would deed portions of the land for conservation purposes. Beginning in 1971, the four partners, through Four Estates, contributed portions of the acreage they had acquired in 1969 to the Nature Conservancy, a national conservation organization receiving its support from the public. The Nature Conservancy is committed to preserving natural diversity by protecting lands containing the best examples of all components of our natural world. The acreage was outside the then and present prescribed boundaries of the National Park. From 1971 to 1974, Four Estates made contributions to the Nature Conservancy as follows: Date
Estate
Parcel
Acres
12/9/71
Bellevue
1
11.10
12/4/72
Beverhoudtsberg
4
10.17
12/4/73
Bellevue
2
11.50
10/29/74
Bellevue
3
2.80
10/29/74
Beverhoudtsberg
5
8.50
*333 In November 1971, Bass, Doan and Gerstacker agreed to purchase Parcel No. 7, Estate Susannaberg, from Halvor N. Richards. The purchase price was $10,000 per acre for the 4.135 acres, or $41,350. The purchase was closed in January 1972. Bass, Doan, and Gerstacker formed a joint venture known as Susanna Seven to hold the land. On September 3, 1975, the partners of Four Estates reached an agreement whereby Bass would withdraw from the partnership because he did not wish to continue to participate in the land contributions. Bass did continue to manage the properties of Four Estates. In effecting Bass' withdrawal, the partners divided the land equally on an acreage basis, with the intent that Bass receive assets equal in value to 25 percent of the entire assets of Four Estates. In accordance with their intentions for the land, Bass received parcels in Estate Beverhoudtsberg and Estate Bellevue that were nearest existing roads, while the other three partners retained parcels that were contiguous to the National Park. The division of property made no distinction between the parcels on account of the proximity or contiguity of roads or the National Park. Pursuant to the agreement *334 providing for Bass' withdrawal from Four Estates, Bass received the following parcels by deed executed September 30, 1975: Estate
Parcel
Acres
Bellevue
9
42.40
Beverhoudtsberg
2
5.35
Beverhoudtsberg
3
5.90
Rendezvous & Dittlief
15A-1
5.40
Rendezvous & Dittlief
15A-2
9.70
Rendezvous & Dittlief
15A-3
27.60
Rendezvous & Dittlief
15H
1.00
Rendezvous & Dittlief
15H-1
44.70
On November 25, 1975, after the withdrawal of Bass, Four Estates made contributions to the Nature Conservancy as follows; Estate
Parcel
Acres
Bellevue
4
2.0
Bellevue
6
10.3
Bellevue
8
3.1
Beverhoudtsberg
6
6.2
Beverhoudtsberg
8
2.8
Beverhoudtsberg
9
4.9
In 1976, Four Estates made additional contributions to the Nature Conservancy. In contemporaneous appraisal reports an appraiser, hired by petitioners, Terry R. Moran, determined the fair market values of the 1976 contributed parcels to be $2,107,365, as follows: Value
Estate
Parcel
Acres
Per Acre
Total Value
Beverhoudtsberg
7
9.62
$14,250
$137,085
Bellevue
5
11.76
14,250
167,580
Beverhoudtsberg
10-16
120.18
15,000
1,802,700
On November 15, 1977, Bass, *335 Doan, and Gerstacker contributed Susannaberg 7A, a one-acre parcel taken from Parcel No. 7, Estate Susannaberg, to the United States for the National Park. ULTIMATE FINDINGS OF FACT The fair market value of Estate Bellevue parcel 5, as of the date of its contribution by petitioners in 1976, was $135,000. The fair market value of Estate Beverhoudtsberg parcels 10 through 16, as of the date of their contribution, was $1,600,000. The fair market value of Estate Susannaberg parcel 7A, as of the date of its contribution in 1977, was $8,000. OPINION The only issues presented for decision are the fair market values of Estate Bellevue parcel 5, Estate Beverhoudtsberg parcels 10 through 16, and Estate Susannaberg parcel 7A. Petitioners have conceded that because their donation of Estate Beverhoudtsberg parcel 7 benefitted other property which they held, they are not entitled to a charitable deduction for such property. Section 170[2] generally provides a deduction for charitable contributions if made to an appropriate organization. Respondent has not argued that the donations here in issue *336 do not qualify as charitable donations for purposes of section 170, but rather argues that petitioners overvalued such donations on their Federal income tax returns. Following the filing of amended pleadings and a partial concession by respondent with respect to Estate Bellevue parcel 5, the parties assert the following values for each of the properties: Petitioners'
Respondent's
Estate
Parcel
Acres
Valuation
Valuation
Bellevue
5
11.76
$167,580
$77,000
Beverhoudtsberg
10-16
120.18
2,126,750
480,000
Susannaberg
7A
1.00
15,700
8,000
Petitioners and respondent have each offered the reports and testimony of an expert witness to support their valuation of the Estate Bellevue and Estate Beverhoudtsberg parcels. Petitioners' expert was Terry R. Moran (Moran), who originally valued the parcels donated to the Nature Conservancy in 1976, at about the time of their donation. Respondent's expert was Raymond L.W. Wright *337 (Wright). Each of the expert appraisers utilized a "comparable sales" approach and a development approach in valuing the property. [3]
The "comparable sales" method of valuation, also known as the market approach or "market data" approach, involves comparison of the subject property with sales data on comparable properties in the region of the subject property. Differences which make a comparable property superior or inferior to the subject property are handled by adjusting the sale price of the comparable property downward or upward, respectively. From the adjusted prices of these comparables, a per acre comparable price is determined which is used as the basis for determining the fair market value of the subject property. The development approach to valuation is used to determine the value of undeveloped land by treating the land as if it were subdivided, developed, *338 and sold. The expected proceeds from sale of the property are discounted over the estimated period required for market absorption of the developed sites. From the proceeds of sale, development costs, incentive costs, and carrying charges are subtracted in order to determine the amount a developer would pay for the undeveloped property, i.e., the fair market value of the property. Costs which are incurred at the beginning of the development of the property are subtracted from the projected income after discounting the income stream, while expenses incurred in relation to selling the developed sites are subtracted prior to discounting the income stream. Using these methods of valuation, the appraisers determined the following values for the subject parcels in Estate Bellevue and Estate Beverhoudtsberg: Comparable Sales
Development
Parcel
Moran
Wright
Moran
Wright
Bellevue 5
$167,580
$73,000
[4]
$75,000
Beverhoudtsberg 10-16
1,742,610
480,000
$2,126,750
490,000
Respondent's appraiser, Wright, is a member of the American Institute of *339 Real Estate Appraisers and a corporate member of the American Institute of Architects and has extensive experience appraising all types of property in the Caribbean area. Wright made a selection and search of comparable sales from approximately 76 property transfers annually on St. John Island. He eliminated "end user" sales (the sales of individual building site parcels) and chose only sites that had development quality. With respect to Estate Bellevue parcel 5, Wright chose comparables ranging in size from 5 to 15 acres, and with respect to Estate Beverhoudtsberg parcels 10 through 16 he chose comparables of at least 50 acres. Wright selected seven comparables in each size category in applying the comparable sales method to the Estate Bellevue and Estate Beverhoudtsberg parcels. In doing his comparable sales analysis, Wright assigned subjective appraisal values to the comparables. To adjust each comparable for the difference in the times of sale, he performed an analysis of sales and resales of property in Chocolate Hole, a subdivision on St. John. This analysis lead him to the conclusion that on average the growth factor of land values on St. John during the period 1970 through *340 1980 was six percent per year. The sale dates of the comparables used by Wright ranged from January 1970 through January 1979. Wright made further adjustments to the sale prices of the comparables based upon the comparables' size, shape, access, zoning and topography, location, waterfrontage, and other special circumstances. Wright determined that the highest and best use of the Estate Bellevue and Estate Beverhoudtsberg parcels was development into single-family homesites. He determined that the parcels were too large to be used as individual building sites. In applying the development approach to valuation of the parcels, Wright made the following assumptions with respect to the parcels: Bellevue #5
Beverhoudtsberg #10-16
Number of Lots
10
100
Price per Lot
$20,000
$ 20,000
Sales Commissions
15% of gross sales
15% of gross sales
and Costs
before discounting
before discounting
Absorption Period
3 yrs
10 yrs
Discount Rate
10%
13%
Developer's Over-
25% of gross sales less
25% of gross sales less
head and Profit
commissions after
commissions after
discounting
discounting
Development Costs
$30,000
$200,000
*341 Petitioner's appraiser, Moran, is an associate member of the Society of Real Estate Appraisers and the American Society of Appraisers and is a candidate for membership in the American Institute of Real Estate Appraisers. Moran, at the time of trial, had been involved in real estate brokerage and development and real estate appraising for 18 years. Moran's place of business was on the island of St. Thomas and he had performed appraisals with respect to property on St. John on a variety of occasions, as well as having been involved in real estate development on St. John. In performing his 1976 comparable sales analysis of the Estate Bellevue and Estate Beverhoudtsberg parcels, Moran chose five comparables upon which to base his valuation. The five sales all occurred in 1975, within approximately nine months of the donation of the property by petitioners. Moran, unlike Wright, generally discussed the attributes of the subject properties and the comparables, and, based upon his generalized view of the differences and similarities of the properties, determined a peracre value for the subject properties. Moran did not make categorized breakdowns of his adjustments or use mathematical *342 averaging of the adjusted comparable prices as did Wright. Moran provided petitioners with an updated report at the end of 1976 and with an additional report in preparation for trial which included additional comparables in support of his conclusions as set forth in his original appraisals. In applying the development approach to the valuation of Estate Beverhoudtsberg parcels 10-16, Moran determined that the highest and best use of the parcels would be development into single-family homesites. Moran also determined that the sales proceeds from the developed lots should not be discounted for an absorption period because of the constant and secure appreciation of land on St. John. The figures used by Moran in his development analysis were as follows: Beverhoudtsberg #10-16
Number of Lots
154
Price per Lot
$ 25,000
Brokerage, Legal, Administrative
13.5%
Absorption Period
Discount Rate
Developer's Overhead and Profit
25%
Development Costs
$241,000
At this point, we pause in our analysis to take note of some of our previous statements made with regard to valuation cases: Too often in valuation disputes the parties have convinced *343 themselves of the unalterable correctness of their positions and have consequently failed successfully to conclude settlement negotiations -- a process clearly more conducive to the proper disposition of disputes such as this. The result is an overzealous effort, during the course of the ensuing litigation to infuse a talismanic precision into an issue which should frankly be recognized as inherently imprecise and capable of resolution only by a Solomon-like pronouncement. * * * [Messing v. Commissioner,48 T.C. 502, 512 (1967).] See also Buffalo Tool & Die Mfg. Co. v. Commissioner,74 T.C. 441, 451-452 (1980). We are now faced with the task of rationally resolving differences in the opinions and often subjective analyses of two qualified experts. In reaching our ultimate conclusions as to the valuation of the parcels here in issue we must, because of the possibility of an appeal, set out a "trail for the appellate court to follow." See Akers v. Commissioner,798 F.2d 894, 897 (6th Cir. 1986), revg. and remanding a Memorandum Opinion of this Court. See also Symington v. Commissioner,87 T.C. 892, 904 (1986). *344 We are constrained to admit, however, that by necessity our conclusions are to some extent based upon Solomon-like pronouncements. In light of the above we now consider the approaches we can take in reaching an ultimate decision in these cases. With respect to the contributions of property made by petitioners in 1976, we have been provided with two methods of valuation. Under the comparable sales approach, the experts have utilized different comparable sales from different time periods, made adjustments to the prices of the comparables based upon their experience and other subjective considerations and, then bootstrapped themselves to a value for the parcels in question. Wright's credentials and experience as an appraiser of property are perhaps the more impressive, while Moran's local knowledge and familiarity with real estate sales and development on St. John is more extensive. The parties' disagreements with respect to the comparable sales analysis relate predominantly to the subjective determinations of the experts with respect to the similarities and differences of the comparables and the subject properties. The differences in these subjective determinations are too numerous *345 to be easily listed. The differences between the approaches of the experts with respect to their development analyses are more readily identifiable. The differences with respect to development costs, brokerage, legal, and administrative costs, and developer's profit are slight. The only significant differences can be listed in three categories: (1) the number of lots into which the property can be divided; (2) the selling price of developed lots; and (3) the amount by which the sale prices should be discounted. Based on the above, we deem it appropriate to set aside the comparable sales approach to valuation in this case. We will attempt to reconcile the differences in the experts' development analyses in reaching a conclusion as to the fair market values of the parcels. [5]
The first difference in the two development *346 analyses which must be reconciled is the determination of the number of lots into which Estate Beverhoudtsberg parcels 10 through 16 could have been developed. Respondent asserts that only 100 lots could reasonably be developed on the Estate Beverhoudtsberg property. Wright, however, admitted that neither the deed restrictions nor the zoning of the property would prevent 120 lots, an average of one per acre, from being developed. Petitioners, on the other hand, assert that 154 lots could be developed in spite of the deed restriction requiring that no more than an average of one lot per acre be developed. Petitioners argue that because the adjoining property which they had earlier donated to the Nature Conservancy was restricted from being developed, such property could be included in determining the number of lots which could be developed in conformance with the deed restriction. We are not convinced by petitioners' argument. We read the deed restriction as envisioning that the one residence per acre restriction would apply to the development plan which petitioners were required to submit prior to developing more than four residences on the property. We do not believe that such *347 development plan could include property which petitioners did not own at the time the development plan was proposed even though such property was adjoining and restricted from development. We also do not accept respondent's argument that the property could only be developed into 100 lots. Wright determined that approximately 70 percent of the property was usable for development into saleable lots. The R-1 zoning designation for the property allows for lot sizes as small as one-half of an acre. Based on the above, we hold that in applying the development approach to the valuation of Estate Beverhoudtsberg parcel 10 through 16, the property should have been treated as developable into 120 lots. Petitioners assert that the developed lots would sell for $25,000 each, while respondent argues for a developed lot price of $20,000 each. Both of the experts determined developed lot prices by reviewing the sales of developed lots in St. John subdivisions during 1976. We find, however, that Moran's local experience and hands on knowledge with respect to the development of property on St. John is more persuasive. With respect to this item of the development approach, therefore, we give *348 greater weight to Moran's conclusions and find that developed lots would sell for $25,000 each. We next consider the amount of the discount, if any, which should be applied to the income stream produced by the sale of the developed lots. Respondent asserts that the developed lots would be sold over a period of 10 years and that a discount rate of 13 percent is appropriate. In applying this discount in his report, Wright notes that rates in effect in 1976 were approximately 9 percent, but that the rate in 1982 had reached as high as 24 percent. The valuation of the property is to be made as of the date it was contributed to the Nature Conservancy in 1976 and subsequent events which could not have been predicted as of the valuation date are generally not relevant. As such, it was inappropriate for respondent's expert to use a discount rate in excess of the rate in effect in 1976 based on the increased rate effective in later years. Therefore, the maximum rate which should be applied in discounting the sales proceeds would be 9 percent. Petitioners argue, however, that property values on St. John were increasing at a rate which would offset time value of money considerations *349 and make discounting inappropriate. Wright estimated in his report that property values on St. John were increasing at a rate of approximately 6 percent per annum during the periods relevant herein, but did not treat this as an offset to the amount by which he discounted the sales proceeds. Moran, on the other hand, determined in his report that land values on St. John were appreciating at an annual rate well in excess of that determined by Wright. Moran attributed this, at least in part, to the limited availability of land on St. John resulting from the large amount of land held by the National Park and the National Park's competition in purchasing land offered for sale within the park's boundaries. We agree with petitioners that the expected appreciation of the property should be treated as an offset to the discounting of the sale proceeds in applying the development approach to valuation of the land. Further, based upon Moran's report and testimony, considered in conjunction with his extensive knowledge of land dealings on St. John, we conclude that the expected appreciation of the property was sufficient to offset the need for applying any discount in valuing the property *350 by the development approach. With respect to applying the development method of valuation to Estate Beverhoudtsberg parcels 10 through 16, we have now resolved the expert's assumptions to the following extent: Resolved Position
Petitioner's Position
Respondent's Position
Number of Lots
120
154
100
Price per Lot
$25,000    $25,000    $20,000
Sales
Commissions
and Costs
13.5%  15% before discounting
Absorption
Period
10 yrs
Discount Rate
13%
Developer's
Over-
head and Profit
25% of Gross Sales
25% of Gross Sales less
Commissions
Development
Costs
$241,000     $200,000
Using the figures we have developed for the number of lots to be developed and the sales prices for such lots, the balance of petitioners' figures would produce a value for the property of $1,604,000. Using respondent's figures for the unresolved numbers would produce a value for the property of $1,712,500. [6] The difference in these figures is almost completely the result of petitioners' calculating developer's overhead and profit on gross sales, while respondent calculates the figure using gross *351 sales less commissions. [7] As Moran was actively involved in property development on St. Thomas and St. John, we will accept his estimate of the cost of development based upon 25 percent of gross sales without reduction for sales commissions and costs. Adjusted for this method of calculating developer's overhead and profit, the use of respondent's figures for all figures which we have not heretofore resolved between the two approaches produces a value of $1,600,000. We find this to be the value of the Estate Beverhoudtsberg property as of the date it was donated to the Nature Conservancy by Four Estates. *352 Petitioners have not provided us with a development approach to the valuation of Estate Bellevue parcel 5, but Wright's expert report did include a valuation of the Estate Bellevue property using this approach. Wright's development analysis with respect to the Estate Bellevue property was very similar in nature to his development analysis with respect to the Estate Beverhoudtsberg property. We therefore deem it appropriate to use Wright's development analysis as a basis for determining the fair market value of Estate Bellevue parcel 5. In making this determination, however, we will make adjustments to Wright's analysis paralleling the adjustments we made to Wright's development analysis of Estate Beverhoudtsberg parcels 10 through 16. Using the development approach, Wright determined a fair market value for Estate Bellevue parcel 5 of $75,000. Moran's comparables sales analysis determined a fair market value of $167,580 for the Estate Bellevue property. Wright, in his development analysis, assumed that the property would have been divided into 10 lots although the property could have been divided into 11 lots without violating the deed or zoning restrictions. Wright again *353 selected a developed lot price of $20,000. Wright discounted the sales proceeds at a rate of 10 percent over an absorption period of three years and used the same percentages for brokerage, legal, and administrative costs and for developer's profit. For the same reasons specified earlier with respect to the valuation of Estate Beverhoudtsberg, we will treat the number of lots which could be developed as 11, the sales price for developed lots as $25,000, and we will not discount the proceeds from the sale of the developed lots. Using the numbers and percentages contained in Wright's analysis as above modified, we find the value of Estate Bellevue parcel 5 at the time it was donated by petitioners to have been $135,000. [8]
The last issue for our consideration is the fair market value of the Estate Susannaberg parcel 7A at the time it was donated by Bass, Doan, and Gerstacker to the United States. Moran did not value the parcel in his report. Wright, *354 in his report, valued the parcel at $8,000. Wright determined that if there had been access from the property to the nearest road the fair market value of the property would have been $15,000. Because such access was not available Wright deducted from the value of the property the amount he estimated as the cost of constructing such access, i.e., $7,000. In December 1977, the Susanna Seven joint venture had Estate Susannaberg parcel 7A appraised by N. O. Wells. The appraisal of N. O. Wells valued the property at $15,700. N. O. Wells, however, was deceased at the time of trial and petitioners have offered no other appraisal of the property. Rather, petitioners rely on the appraisal by N. O. Wells and upon Wright's alleged error in his treatment of the cost of access to Estate Susannaberg parcel 7A to establish the value of the property. Under these circumstances we feel constrained to accept Wright's appraisal of Estate Susannaberg parcel 7A. Petitioners' main dispute with Wright's appraisal relates to his treatment of the cost of creating access to the parcel. Petitioners allege that Wright overestimated the cost of constructing access to the property. Further, petitioners *355 allege that such access, if constructed, would benefit surrounding parcels and the cost of such access must, therefore, be partially attributed to the surrounding parcels. Petitioners contend that if these errors were corrected, Wright's appraisal would confirm the appraisal of N. O. Wells. Wright, however, testified that he had consulted a local engineering firm in determining his costs for constructing access to the parcel. Wright also testified that, in 1977, there was no indication that surrounding parcels were being developed which would share in the cost of creating access to the area. As Wright is the only expert to appraise the property and testify at trial with respect to such appraisal, and because we have not been presented with evidence which clearly establishes that his assumptions are erroneous, we find the value of Estate Susannaberg parcel 7A to be $8,000, as determined by Wright. Decisions will be entered under Rule 155.
Footnotes
1. Cases of the following petitioners are consolidated herewith: Herbert D. Doan and Anna J. Doan, docket No. 10939-84, and Carl A. Gerstacker and Esther S. Gerstacker, docket No. 10940-84.↩
2. Unless otherwise indicated, all section references are to the Internal Revenue Code as amended and in effect during the years in issue and all Rule references are to the Tax Court Rules of Practice and Procedure.↩
3. Moran's report applies the development approach only to the valuation of Estate Beverhoudtsberg parcels 10 through 16.↩
4. Moran did not apply the development approach to the valuation of Estate Bellevue parcel 5.↩
5. Because petitioners have not provided us with a development analysis with respect to the valuation of Estate Bellevue parcel 5, we will first attempt to reconcile the development analyses offered with respect to Estate Beverhoudtsberg parcels 10 through 16 and then make similar adjustments to Wright's development approach in valuing Estate Bellevue parcel 5.↩
6. The values determined by using the figures which we have resolved and the parties' numbers for the unresolved figures are calculated as follows: ↩
Petitioners'
Respondent's
Figures
Figures
Gross Sales (120 X $25,000)
$3,000,000 $3,000,000 Commissions
(405,000)
(450,000)
Developer's Over-
head and Profit
(750,000)
(637,500)
Development Costs
(241,000)
(200,000)
Fair Market Value
$1,604,000 $1,712,500 7. The difference between the numbers assigned to development costs by the parties is very nearly offset by the difference in their figures for sales commissions and costs.↩
8. This figure is calculated as follows: ↩
Gross Sales (11 X $25,000)
$275,000 Commissions
(41,250)
Developer's Over-
head and Profit
(68,750)
Development Costs
(30,000)
Fair Market Value
$135,000