931 F.2d 54
Unpublished Disposition
 NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
Heriberto A. FERRARI, Noemi O. Ferrari, Petitioners-Appellants,
v.
COMMISSIONER OF INTERNAL REVENUE, Respondent-Appellee.
 No. 90-2042.
 United States Court of Appeals, Fourth Circuit.
 Argued Oct. 30, 1990.
Decided April 23, 1991.
 
 Appeal from the United States Tax Court.
 Charles Evans Johnson, Moore & Van Allen, Charlotte, N.C. (Argued), for appellants; C. Wells Hall, III, Moore & Van Allen, Charlotte, N.C., on brief.
 Gilbert Steven Rothenberg, Tax Division, United States Department of Justice, Washington, D.C. (Argued), for appellee; Shirley D. Peterson, Assistant Attorney General, Gary R. Allen, Laura Marie Conley O'Hanlon, Robert L. Baker, Tax Division, United States Department of Justice, Washington, D.C., on brief.
 USTC
 AFFIRMED.
 Before POWELL, Associate Justice (Retired), United States Supreme Court, sitting by designation, SPROUSE, Circuit Judge, and C. WESTON HOUCK, United States District Judge for the District of South Carolina, sitting by designation.
 PER CURIAM:
 
 
 1
 This is an appeal from a decision of the United States Tax Court determining that the appellants were liable for income tax deficiencies totalling $94,390 for the taxable years 1978 through 1981. The question presented in this appeal is whether the Tax Court erred in its determination of the fair market value of twenty-one objects of pre-Columbian art, for charitable contribution purposes. Based upon the entire record and its own best judgment, the Tax Court, with five exceptions, determined the fair market value of each piece in issue to be a value which lies at the midpoint between the median values given by the taxpayers' expert witness, Ronald W. Dammann (Dammann), and the high values given by the Commissioner's expert witness, Claudia Giangola (Giangola). As to the remaining pieces, the parties agreed upon the applicable value of three of the items in either their initial appraisals or as a result of Dammann's revision of his appraised value at trial, and the Tax Court adopted these valuations. In the other two instances, the Tax Court found the appraisals of Giangola to be more accurate than Dammann's and therefore relied more heavily on Giangola's figures. On review, we conclude that the determinations of the Tax Court were not clearly erroneous and affirm its decision.
 
 I.
 
 2
 Heriberto A. Ferrari and Noemi O. Ferrari (taxpayers) donated twenty-one pre-Columbian art objects to the Duke University Museum of Art and the Mint Museum of Art during the years 1978 through 1981. On their federal income tax returns for those years, the taxpayers claimed charitable contribution deductions for the donated art objects, which totalled $145,000, $130,500, $84,000, and $18,000 for the years 1978, 1979, 1980, and 1981, respectively.
 
 
 3
 James M. Silberman performed the appraisals of the objects donated by the taxpayers during the years 1978 through 1980. Paul A. Clifford appraised the objects donated in 1981. When Silberman subsequently entered into an agreement with the government not to testify about his appraisals of charitable contributions, the taxpayers obtained another appraisal of the objects. This appraisal was performed by Dammann on September 24, 1984.
 
 
 4
 On August 7, 1987, the Commissioner determined income tax deficiencies of $63,451, $24,093, $34,237, and $18,953 against taxpayers for the taxable years 1978, 1979, 1980, and 1981, respectively. The deficiencies resulted from the Commissioner's redetermination of the value of the pre-Columbian art objects donated by the taxpayers during the years in issue. The taxpayers filed a petition in the United States Tax Court challenging the Commissioner's determination.
 
 
 5
 At trial, both parties introduced extensive expert testimony.
 
 
 6
 Dammann, the taxpayers' expert, relied on his September 1984 appraisal of the objects. This appraisal stated that each article was authentic and that the condition of the articles was of good to excellent quality unless otherwise noted. However, at trial Dammann testified that he subsequently reviewed the appraisal and revised his opinion with regard to certain objects. He testified that he recently learned that one Jaina figurine had undergone massive restoration, and he reexamined it prior to the trial. Based on the same, he revised the valuation of the Jaina figurine from the original appraised value of $18,000 down to a valuation of $500.
 
 
 7
 Dammann also revised his valuation of a polychrome cylinder base from the Maya civilization. Noting that the piece had been broken and had undergone more repainting than he had originally thought, Dammann testified that the original $30,000 valuation he had placed on the piece was too high and that the actual value would be around $15,000 to $20,000.
 
 
 8
 Dammann testified that the fair market value of the art objects was a fluctuating value and depended on the individual dealer. He also stated that the fair market value of an individual piece was "what you can get for it." (A. 197.) When asked if the value of a piece fluctuated within a given percentage range, Dammann testified that it was difficult to make such a determination.
 
 
 9
 After hearing Dammann's testimony, the Tax Court stated that it could not accept Dammann's original appraisals since he had testified that his figures were at the top of the range. Accordingly, the Tax Court requested that Dammann provide figures reflecting a median value rather than the highest value warranted. For eighteen of the twenty-one art objects at issue Dammann's revised figures were lower than his original estimates.
 
 
 10
 The Commissioner's expert witness, Giangola, agreed with Dammann that comparable prices are important when determining fair market value, however, she testified that other factors should also enter into the determination. She opined that factors such as authenticity, rarity, size, condition, and one's own personal experience of having dealt with similar pieces must also be considered. Although she agreed that there are ranges, she testified that the ranges among reputable dealers are not as broad as Dammann indicated. According to Giangola's testimony, the applicable price range for a given object is a maximum of ten to twenty percent below the high end value. She also stated that the figures in her appraisal are at the upper end of the range.
 
 
 11
 Giangola's testimony and appraisal indicated that she had personally inspected all of the art objects in issue on March 10, 1989. As a result of this inspection, she determined that almost all of the pieces in issue had been damaged and that many had been reworked. She testified that, in her opinion, a piece that is more than fifty percent restored is in the category of dubious authenticity rather than being categorized as a genuine object from a particular period. Her appraisal indicates, that in her opinion, the Jaina figurine is a "fake" with a value of $200. (A. 139.)
 
 II.
 
 12
 The Tax Court found both experts to be credible and well qualified to value the art items in dispute. It further noted that the differences between the credentials of the two experts was not significant except for Dammann's far greater practical experience in selling and, thus, valuing pre-Columbian art.
 
 
 13
 Based on the testimony of both experts, the Tax Court determined the applicable market for pre-Columbian art to be the retail market at art galleries such as the Stendahl Galleries and the Ancient Art of the New World, Inc. It further found that galleries have no uniform way of pricing such art, and pricing is essentially a question of judgment, experience, the price paid by the gallery to obtain an object, and the gallery's level of mark-up. Thus, it concluded that the fair market value with respect to pre-Columbian art is not a single price but a range of prices.
 
 
 14
 The Tax Court noted that Giangola's testimony indicated that the range was fifteen to twenty percent of the high end value, while Dammann seemed to conclude that the range was almost infinite. The Tax Court found that Giangola's testimony on this point was much more credible and accepted it. However, this did not solve the valuation problems because in most instances Dammann's median values differed from Giangola's high values by more than twenty percent.
 
 
 15
 The Tax Court refused to adopt either expert's valuations of all the objects. In declining to adopt the valuations of Dammann, the Tax Court noted that the 1984 date of Dammann's appraisal weighed against him since his recollection was not sufficiently fresh to permit him to answer some of the questions asked at trial. The Tax Court also declined to adopt Giangola's valuations, noting that Giangola, in her capacity as a member of the Commissioner's Art Advisory Panel and together with other panel members, had previously appraised these pieces in July 1988 on the basis of photographs and other information. Thus, the Tax Court viewed Giangola's opinions as conservative and as probably reflecting discussions with other panel members.
 
 
 16
 The Tax Court noted that the ranges which the experts described cover, in their judgment, the range of prices among various art galleries which handle pre-Columbian art. Thus, the Tax Court concluded that the entire range reflects retail sales prices. After weighing the testimony and appraisal of each expert, the Tax Court determined that the fair market value of sixteen of the twenty-one objects was the value lying at the midpoint between Dammann's median values and Giangola's high values. The Tax Court expressed confidence "that one could find a comparable piece of this art which in some gallery has sold at a value approximately equal to the value we have found." (A. 165.)
 
 
 17
 With regard to two of the remaining pieces, the parties agreed upon the applicable value, and the Tax Court adopted those valuations. Based upon Giangola's description of the Jaina figurine and Dammann's testimony that it had been glued together with massive restoration, the Tax Court found that the figure fell outside the definition of pre-Columbian art and that Giangola's valuation was more accurate.
 
 
 18
 As to item number 79.10.3, a polychrome flat bottom cylinder, the Tax Court noted that Dammann had made no change in his original value when he complied with the request to establish a median price, and that he failed to testify that his original value did not reflect the high end value. For this reason, the Tax Court relied more heavily on Giangola's valuation of this item. Finally, with respect to item number 78.41.2, another polychrome flat bottom cylinder, the Tax Court noted that this object was originally valued by Dammann at $30,000. However, due to the presence of plaster and extensive repainting on the inside of the object, he had revised his high value to a range of $15,000 to $20,000 and fixed his median value at $15,000. Since Giangola also assigned a value of $15,000 to this item, the Tax Court found the value to be $15,000.
 
 III.
 
 19
 The taxpayers contend that the Tax Court's rejection of the values given by each expert and the averaging of those values in redetermining the fair market value of sixteen of the twenty-one objects is clearly erroneous. The taxpayers also assert that the Tax Court erred in according insufficient weight to the testimony of Dammann, in light of his far greater experience and because his appraisal was performed closer in time to the applicable valuation date.
 
 
 20
 The taxpayers rely on Akers v. Commissioner, 798 F.2d 894 (6th Cir.1986), as support for their position that the Tax Court's valuation is clearly erroneous. At issue in Akers was the valuation of certain waste-water treatment plants donated to Vanderbilt University. The taxpayers had claimed a deduction of $201,000 for the donated plants. Id. at 896. Three of the taxpayers' experts valued the plants at $184,861, $210,000, and $243,155, respectively, while the Commissioner's expert "who had no experience with pilot waste-water treatment plants," valued the plants at $20,500. Id.
 
 
 21
 After discussing the testimony of all the experts, but without attempting to quantify any adjustments that might have been appropriate to their valuation figures, the Tax Court made what it described as a " 'Solomonlike pronouncement' " and assigned a fair market value of $75,000 to the plants. Id. at 897. In reversing the Tax Court's decision, the Sixth Circuit found that the Tax Court's opinion offered no explanation of the process through which it arrived at the $75,000 valuation figure and had "no discernable logic." Id.
 
 
 22
 That is far different from what we are now faced with. The Tax Court here fully explained the process it used in valuing the twenty-one art objects in issue. It carefully analyzed each appraisal, embraced portions of each, and reasonably and logically arrived at its values. It would seem that the process it followed is very similar to the one a willing buyer and a willing seller would engage in to determine fair market value. The Tax Court was well within its discretion in refusing to adopt the appraisal of one expert or the other.[1]
 
 IV.
 
 23
 We may set aside the Tax Court's factual findings as to fair market value only if we find them clearly erroneous. Burbage v. Commissioner, 774 F.2d 644, 646 (4th Cir.1985). A finding is clearly erroneous when, after reviewing the entire evidence, the reviewing court is left with a definite and firm conviction that a mistake has been committed. United States v. United States Gypsum Co., 333 U.S. 364, 395 (1948). After reviewing the entire record, we do not have a definite and firm conviction that a mistake has been made. The judgment of the Tax Court is accordingly
 
 
 24
 AFFIRMED.
 
 
 
 [1]
 It is well established that the tax court is not bound by the opinion of an expert witness. See Anchor Co. v. Commissioner, 42 F.2d 99, 100 (4th Cir.1930). See also Orth v. Commissioner, 813 F.2d 837, 842 (7th Cir.1987) (stating that fair market value is a question of fact for the tax court to resolve considering all theevidence of record); Silverman v. Commissioner, 538 F.2d 927, 933 (2d Cir.1976) (stating that the tax court is not bound by the formulas or opinions proffered by expert witnesses)