J. CLARK AKERS, III and ELEANOR M. AKERS, ET AL., [1] petitioners, v. COMMISSIONER OF INTERNAL REVENUE, respondent Akers
Docket Nos. 6717-77, 6729-77, 6734-78, 6759-78, 5874-80, 5875-80, 5876-80
United States Tax Court
T.C. Memo 1992-476; 1992 Tax Ct. Memo LEXIS 498; 64 T.C.M. (CCH) 546; August 20, 1992, Filed *498 Decisions will be entered under Rule 155. For Petitioners: Mark H. Westlake. For Respondent: Vallie C. Brooks and Robert B. Nadler. DAWSON
DAWSON
SUPPLEMENTAL MEMORANDUM OPINION DAWSON, Judge: After remand by the United States Court of Appeals for the Sixth Circuit, these cases were reassigned to Special Trial Judge Lee M. Galloway pursuant to the provisions of section 7443A(b)(4) and Rules 180, 181, and 183. [2] The Court agrees with and adopts the opinion of the Special Trial Judge which is set forth below. OPINION OF THE SPECIAL TRIAL JUDGE GALLOWAY, Special Trial Judge: These cases are before us on remand from the United States Court of Appeals for the Sixth Circuit. Akers v. Commissioner, 798 F.2d 894 (6th Cir. 1986), reversing and remanding T.C. Memo. 1984-208. [3]
*499 The Court of Appeals has directed us to (1) revalue a charitable donation of equipment and spare parts to Vanderbilt University claimed by J. Clark Akers, III and William B. Akers (hereinafter referred to as petitioners) on their Federal income tax returns for 1975 and 1976; and (2) reconsider the tax consequences pertaining to a bargain rental by James and Estelle Akers of a house owned by a corporation controlled and operated by their sons, Clark and William, and the subsequent purchase of the house by Estelle Akers, pursuant to an option granted in 1959 and exercised in 1976. In this Court's opinion, T.C. Memo. 1984-208, it was held that, as of December 31, 1975, the fair market value of certain equipment and spare parts donated by petitioners to Vanderbilt University, an eligible charitable donee under section 170(c)(2), was $ 75,000, rather than $ 201,000, as claimed by petitioners on their 1975 Federal income tax returns. The donated equipment consisted of two "pilot" wastewater treatment plants mounted on conventional flatbed trailers and accompanied by two crates (weighing 9,000 pounds) of spare pumps, pipes, and laboratory equipment. In so holding, we *500 valued the property using a cost approach and accounting for depreciation or wear and tear. On appeal, the Sixth Circuit reversed our valuation as being unsupported and unexplained. Consequently, our decision was "remanded for revaluation of the donated equipment". The issue involving the bargain rental and purchase of the house, which is explained in the first footnote in the Sixth Circuit's Opinion, 798 F.2d at 894-895, was addressed by the Court of Appeals in an unpublished opinion. Estate of Akers v. Commissioner, 798 F.2d 469 (6th Cir. 1986). [4] Our decision was reversed and remanded with respect to its treatment of the Akers family corporation's bargain rental and sale of the house as additional compensation to James C. Akers, petitioners' father. The Sixth Circuit directed us to reconsider, under a controlling regulation, whether the value of the bargain rental and purchase by Estelle Akers should be treated as additional compensation to petitioner-estate in 1976, and, if we decide that it is not, whether it should be treated as constructive dividends to petitioners [5] in that year. *501 The findings of fact set out in our prior opinion are incorporated herein by this reference, as hereinafter modified and augmented. The stipulations and exhibits are also incorporated herein by this reference. Respondent determined deficiencies in petitioners' Federal income taxes as follows: Docket
Petitioners
Nos.  Year
Deficiency
J. Clark Akers, III
6734-78
1974
$ 15,704.93
and Eleanor M. Akers
1975
47,603.88  William B. Akers and
6759-78
1974
$ 14,927.70
Jo Ann Akers
1975
53,713.62  Estate of James C.
5874-80
1976
12,929.62  Akers, Estelle L. Akers
Executrix, and Estelle
L. Akers
J. Clark Akers, III and
[1] 5875-80 1976
56,089.00  Eleanor M. Akers
William B. Akers and Jo
[1] 5876-80 1976
56,186.00  Ann Akers
1. Valuation of Donated Equipment and Spare Parts
Detailed findings of fact are contained in our prior opinion, T.C. Memo. 1984-208, and in the Court of Appeals' decision, 798 F.2d 894. But, as background, we will briefly summarize certain pertinent facts. In the early 1970s, two portable *502 "pilot" wastewater treatment plants (herein referred to as the plants or equipment) were built for use in experimenting with different types of biological and chemical wastewater treatment processes. The plants were mounted on conventional flatbed trailers and accompanied by two crates of spare pumps, pipes, and laboratory equipment (herein referred to as spare parts). Between October 1972, and August 1973, the original owner of the plants paid third-party materialmen and fabricators approximately $ 165,000 for building and furnishing the two plants. This amount did not include the cost of the trailers or the owner's engineering, design and overhead costs. Of the $ 165,000 paid, approximately $ 54,000 was for refurbishing the equipment in July and August of 1973. When the original owner experienced financial difficulties, a secured creditor offered the two plants for sale in a form letter distributed mainly to equipment manufacturers. The bid solicitation letter contained a representation that over $ 300,000 was spent to equip the trailers. Of the two bids that were submitted, petitioners' $ 17,500 bid was accepted in early 1974. An inventory of the equipment, which was located *503 at Albany, California, near San Francisco, was made on April 9, 1974, in conjunction with the sale. The inventory stated, in pertinent part, that although "the general overall condition of the equipment was * * * good * * * since the equipment is stored out of doors, fairly near the bay, it * * * will need maintenance in the not too distant future if it is to retain its value". Petitioners took title to the equipment on July 17, 1974, and had the two plants and spare parts transported to Tennessee. The plants were inspected by Professor Jack Roth, a chemical and environmental engineer at Vanderbilt University, upon their arrival in Nashville. Professor Roth determined that the plants were not in operating condition at that time. After discussions with both Vanderbilt University and the Nashville Metropolitan Government (Metro), petitioners allowed Metro to use the equipment for design studies on a major expansion of its own wastewater treatment facilities during the fall of 1974 and winter of 1975. Metro made the plants operational at a cost of approximately $ 14,000. Vanderbilt University also conducted experiments using one of the plants during 1975 and 1976 as part of a *504 biological treatment study funded by the Environmental Protection Agency. On December 31, 1975, petitioners conveyed title to the plants and spare parts to Vanderbilt University as a charitable contribution to further the educational purpose of the Vanderbilt School of Engineering. Several months prior to the transfer date, Vanderbilt had the plants appraised by two well qualified professional engineers. The first appraiser, Gerry Shell, provided a cost estimate of the two plants based on his judgment of the present condition of the plants and their replacement cost as of October 16, 1975. Mr. Shell's estimated value of the equipment, not including the spare parts, was $ 184,861. The second appraisal, dated December 29, 1975, was provided by Col. William F. Brandes, Director of the Water Resource Center at the University of Tennessee, based on his inspection of the equipment some time in the fall of 1975. His appraisal estimated the value of the equipment and the spare parts, using the April 9, 1974, inventory direct costs as a starting point. Col. Brandes' method of appraisal involved a cost approach where the values of the equipment and the spare parts were estimated separately. *505 The equipment was valued at $ 164,510 and the two crates of spare parts (original cost $ 35,000) were valued at $ 46,000, for a total value of $ 210,510. [6] Col. Brandes also used a second method by which he estimated present worth based on a projected reasonable rental fee, including repair and maintenance. Five years later, in December 1980, petitioners asked Dr. John H. Koon, another well qualified civil and sanitary engineer, to appraise the plants. Dr. Koon had seen the equipment in use when visiting the American Enka Plant site at Enka, North Carolina, in July 1973. Although Dr. Koon did not appraise the equipment at that time, he learned that the equipment was in working order in July 1973, with no operational problems noted by the AmericanEnka environmental engineers. It was Dr. Koon's opinion that the equipment (exclusive of the spare parts) had been worth $ 130,290 on site in California in April 1974. *506 In arriving at that figure, Dr. Koon considered the unique value of the equipment as a research tool. Upon being informed that the date of appraisal of the equipment should have been December 1975 rather than April 1974, Dr. Koon increased his replacement cost appraisal to $ 243,155 by using the Engineering News Record Construction Cost Index. In January 1982, respondent had a staff engineer, Stephen A. Wilgus, who appraised the plants and estimated their worth in 1975. Mr. Wilgus, who had no experience with pilot wastewater treatment plants, made an on-site inspection of the two plants in January 1982. After considering the cost, market, and income approaches to valuation, Mr. Wilgus concluded that the fair market value of the two plants on December 31, 1975, was $ 20,500. He ignored the unique value of the plants as a research tool and did not include the spare parts in his valuation estimate. Mr. Wilgus also ignored the fact that Metro rehabilitated the plants prior to December 31, 1975. In its prior opinion this Court noted "various weaknesses" in Mr. Wilgus' method of valuation and rejected respondent's use of the "winning bid price" as the best indicator of the value *507 of the equipment in this case. This Court has recognized that some Courts of Appeals, including the Sixth Circuit, prefer that, in valuing donated property, we "set forth the underpinnings for our ultimate determination so as to provide * * * a trail for the appellate court to follow". Estate of Gilford v. Commissioner, 88 T.C. 38, 50 (1987); Symington v. Commissioner, 87 T.C. 892, 904 (1986). Upon reconsideration of the record and the opinions of petitioners' expert witnesses, we have revalued the donated property as directed by the Court of Appeals. In our judgment the valuation report, testimony, methodology, and opinion of Col. Brandes correctly determined the reproduction cost new (RCN) of the equipment to be $ 164,000. He was the only expert witness who separately appraised the unused spare parts to be $ 46,000. For reasons to be discussed, we conclude that the donated equipment should be valued by using the reproduction cost new less depreciation (RCNLD) method. This method yields fair market value by first determining reproduction cost new (RCN) and then subtracting estimated depreciation therefrom. Reproduction cost new less *508 depreciation (RCNLD) is an acceptable method of valuation under certain circumstances. In Estate of Palmer v. Commissioner, 839 F.2d 420, 424 (8th Cir. 1988), revg. 86 T.C. 66 (1986), the Court of Appeals for the Eighth Circuit stated: Reproduction cost is a relevant measure of fair market value when the property to be valued is unique, its market limited, and when there is no evidence of sales of comparable properties. [Citations omitted.] See also Waranch v. Commissioner, T.C. Memo. 1989-596, where we stated "that while reproduction cost may be in excess of fair market value, that is why depreciation is taken into account. The depreciation takes into consideration actual physical loss in value of the properties as well as any degree of technical obsolescence". The American Institute of Real Estate Appraisers [7] describes the circumstances where RCNLD may be a useful indicator of value as follows: The cost approach is also used to estimate the market value of * * * special-purpose properties, and other properties that are not frequently exchanged in the market. Buyers of these properties often measure the price they *509 will pay * * * against the cost to build a replacement, minus accrued depreciation, * * *. If comparable sales are not available, they cannot be analyzed to estimate the market value of such properties. Therefore, the currently accepted market indications of depreciated cost, * * * are the best reflections of market thinking and, thus, of market value. * * * The cost approach is particularly important when a lack of market activity limits the use of the sales comparison approach and when the proprieties to be appraised * * * are not amenable to valuation by the income capitalization approach. * * * [American Institute of Real Estate Appraisers, Appraisal of Real Estate, 349-351 (9th ed. 1987)]. We agree with Col. Brandes that the reproduction cost new of the equipment was $ 164,000 on December 31, 1975, and the spare parts was $ 46,000, or a total value of $ 210,000 *510 before depreciation. We consider next the appropriate depreciation adjustments necessary to the total RCN valuation of the equipment and spare parts in order to arrive at RCNLD. In Waranch v. Commissioner, supra, it was stated that: We have held that the RCNLD method is important evidence of value and has therein important elements to prove either market value or actual value. However, we have recognized that depreciation is to be concretely determined by inspection and that factors such as actual use, condition, and age are all relevant in arriving at an appropriate rate of depreciation. Kinsman Transit Co. v. Commissioner, 1 B.T.A. 552 (1925); Rockford Malleable Iron Works v. Commissioner, 2 B.T.A. 817 (1925). * * * Petitioners contend that the actual condition of the wastewater treatment plants at the time the equipment was donated to Vanderbilt University was reflected in the expert reports of Mr. Shell, Col. Brandes, and Dr. Koon. But we note that neither Mr. Shell's nor Col. Brandes' report contained sufficient detail to enable us to tell the extent to which they may have considered the amount of depreciation *511 that should reduce their valuations. Although the reports of these appraisers included schedules valuing equipment items individually, or summarized by trailer, there is no indication that the valuations were arrived at by the RCNLD method. Mr. Shell's estimate of RCN was based on "my judgment of the present conditions (sic) of the equipment and replacement cost". Cf. Waranch v. Commissioner, supra.Col. Brandes' report comments only on the RCN value of the equipment he inspected at the Metro plant, using the April 9, 1974, inventory direct costs as a starting point in calculating his estimate of value. Dr. Koon's later report discusses only the equipment inspected in 1980, although he had seen the equipment in operation in Enka, North Carolina, in 1973. Accordingly, contrary to petitioners' contention, some adjustment must be made for depreciation of the equipment and spare parts, which apparently were placed in service by the original owner on or about October 1972. We agree with respondent that a determination of the fair market value of the donated property based on the RCNLD method requires us to estimate depreciation of the equipment accrued during *512 its estimated useful life. We otherwise disagree with respondent. For the purpose of calculating the depreciation adjustment necessary to arrive at RCNLD, we think depreciation should be measured from the date the equipment first became available for service regardless of who owned it. See Consumers Power Co. v. Commissioner, 89 T.C. 710, 724-726 (1987); Oglethorpe Power Corporation v. Commissioner, T.C. Memo 1990-505. Based on this record, we conclude that construction of the equipment was completed and the equipment was placed in service in October 1972 -- the date the original owner of the equipment began payments for fabrication and furnishing of the plants. Accordingly, the equipment was subject to depreciation of approximately 3 years from October 1972, until October 1975, when Mr. Shell and Col. Brandes appraised the property. Dr. Koon estimated the useful life of the equipment to be "at least 12 years". He based his opinion on this observation of the operating condition of the equipment when in North Carolina in 1973 and upon his knowledge of and familiarity with similar equipment located at the University of California research *513 station in Richmond, California. Dr. Koon constructed and worked on the University of California equipment, which had design and construction features similar to the plants in issue. The University of California equipment was used regularly and was basically in good working condition after 12 years. According to Dr. Koon, the plants in issue would have a shorter useful life if they were actively used. Here the plants in issue were used by the original owners on three occasions, twice in California, and once in North Carolina, a total of 8 months before the equipment was sold to petitioners. During the fall of 1974 and the winter of 1975, the plants were repaired, maintained, and used by Metro to study a proposed nitrification plan. The plants were also used by Vanderbilt University to conduct experiments in 1975 and 1976 in connection with Vanderbilt's extensive environmental engineering program and were valuable research tools to Vanderbilt, one of the leading universities in the industrial wastewater treatment field at the time of the donation. The fact that the equipment was of a specialized nature is not a factor limiting the useful life of the property. Dr. Koon testified *514 that research activity in the wastewater treatment field was at its height in 1974 and 1975 because the Clean Water Act required municipalities and industries to have defined levels of wastewater treatment in place in 1977. Based on the actual use, condition, and maintenance of the equipment, we conclude that the useful life, for computing depreciation on the equipment from October 1972 to December 1975, was 12 years. Accordingly, the previously calculated RCN, totaling $ 210,000, is reduced by depreciation of 25 percent, totaling $ 52,500. The resulting RCNLD of the donated property is computed as follows: Reproduction Cost New
$ 210,000
Less Depreciation
52,500
TOTAL
$ 157,500
Therefore, we find as a fact and hold that the fair market value of the donated property on December 31, 1975, was $ 157,500. 2. Bargain Rental and Purchase of House
a. Background
James C. Akers (also known as J. Clark Akers, Jr.) was the first Director and Engineer for the Davidson County, Tennessee, Highway Department, a position he held until his retirement in 1955. While there he pioneered the use of modern emulsified asphalt on highways in place of traditional hot asphalt. *515 Prior to his retirement, his sons, J. Clark Akers III and William formed Globe Company, Inc., (Globe) a company that manufactured emulsified asphalt. James Akers joined this company as an officer-employee on his retirement. On May 4, 1959, the company purchased a residence at 248 Harding Place, Nashville, Tennessee, for $ 21,500. On or about the same date, the company granted an option to James Akers and his wife, Estelle. By the terms of the option, James and Estelle Akers were permitted to rent the house for their joint lives at a cost of $ 100 per month plus maintenance expenses. Paragraph 2 of the option provided that: So long as said property is occupied by the said J. Clark Akers, Jr. and wife Estelle L. Akers, they or the survivor of them shall have the right and option to acquire said property for the cash purchase price of Twenty-One Thousand Five Hundred Dollars ($ 21,500.00) plus One Thousand Dollars ($ 1,000.00). The purchase price was $ 1,000 more than the company's initial cost, and the option further provided that James and Estelle Akers would be given credit for one-half of all rentals previously made. James Akers died in 1976. A qualified real estate *516 appraiser for his estate found that the fair market value of the house on December 7, 1976, was $ 43,000. On December 31, 1976, Estelle Akers exercised the option to purchase the house from Asphalt Products Company, Inc., the successor corporation to Globe. The option price of $ 22,500 was reduced by a credit of $ 10,500, which represented one-half of the rental payments previously made by the Akers. The sum of $ 11,896 was paid in cash by Estelle Akers for the house. The Estate of James C. Akers and Estelle Akers reported no income from this transaction on their Federal income tax return for 1976. In the notice of deficiency sent to the Estate of James C. Akers and Estelle Akers, respondent determined that they received additional income of $ 3,300 in 1976 as a result of their rental of the house from Asphalt at less than fair market value of $ 375 per month, rather than the $ 100 per month they paid. Respondent also determined that they received additional income of $ 31,014 in 1976 as a result of the purchase of the house from Asphalt at less than fair market value. These two adjustments to income resulted in a deficiency of $ 12,929.62 for 1976. Taking a protective and *517 alternative position, respondent determined that Clark and William Akers, the sons of James and Estelle Akers and controlling shareholders of Asphalt, received constructive dividends in 1976 as a result of the bargain rental and purchase of the house. Both parties agreed at the trial and in their briefs that the bargain rental and purchase of the house, if taxable at all, constituted additional compensation to James C. Akers for his services to Asphalt and its predecessor corporation, Globe. The Akers' primary argument, which we rejected, was that fair consideration was given in exchange for the option. The parties disagreed as to the year in which the bargain element of the option is taxable. James and Estelle Akers contended that the compensation was taxable in 1959 when the option was granted, and respondent contended that it was taxable in 1976 when the option was exercised. Initially, respondent's primary position was that Clark and William realized constructive dividends in 1974, 1975, and 1976 in the amount of the difference between the fair rental value and the amounts paid, and that they also received constructive dividends when the property was sold to Estelle for the *518 difference between the fair market value of the residence and the amount paid. Alternatively, respondent asserted that the transactions resulted in additional compensation to James C. Akers under section 61. In T.C. Memo 1984-208, we found as a fact, based on the record, that Clark and William "did not receive constructive dividends in the Harding Place residence transaction". We concluded that the economic benefit received by James and Estelle Akers from the bargain rental and purchase of the house was taxable as compensation under section 61. In its unpublished decision in Estate of Akers v. Commissioner, 798 F.2d 469 (6th Cir. 1986), the Court of Appeals reversed and remanded this case with direction that we apply section 1.421-6, Income Tax Regs., "to determine the tax consequences of the option". In doing so, the Court of Appeals commented as follows: The tax court made none of the findings required under this regulation or the case law on which it is based because the court ruled that the option was unenforceable under Tennessee state law. The Commissioner now concedes that this ruling was in error but urges us to hold that Mrs. Akers *519 has failed to meet her burden of proving the facts listed in the regulation as a matter of law. We decline to so hold on the basis of the record before us. It is important and more appropriate, we think, for the tax court to make these complex factual determinations in the first instance. We note, for example, that at oral argument, counsel for the government could not say with certainty that the option was or was not transferable by the Akers. This and other uncertainties should be considered first by the trial court. The fact that, inexplicably, neither party argued the applicability of section 1.421-6 until the question was raised by this court at oral argument also impels us to remand. Mrs. Akers argues that the regulation exceeds the reach of existing case law and the Secretary's authority. This issue should be considered first by the tax court as well. The Court of Appeals also commented in Akers v. Commissioner, 798 F.2d 894, 895 n.1 (6th Cir. 1986), that "we asked the Tax Court to take another look at the compensation question, and it is therefore appropriate that we ask the Tax Court to take another look at the constructive dividend question *520 if it changes its mind on the compensation issue". (Emphasis added.) b. Compensation or Constructive Dividends
We have again considered the compensation issue, and, after a review of the record, we are persuaded that our prior conclusion is fully supported by the facts and the evidence. Consequently, we reiterate our holding that the economic benefit received by James and Estelle Akers from the rental and purchase of the house is taxable as compensation under section 61, and that Clark and William Akers did not receive constructive dividends in the transactions. See Commissioner v. LoBue, 351 U.S. 243 (1956); Commissioner v. Smith, 324 U.S. 177, 181 (1945). The pertinent facts support this conclusion. James Akers was a valuable officer-employee, but not a shareholder, of Globe and later of Asphalt Products. Although he was a respected authority in the road paving and highway construction business, he received rather modest cash compensation from Globe and Asphalt Products for his consulting services. He was always treated as an employee by his sons. By providing him with a bargain rental for the Harding Place residence and *521 granting him and his wife an option to acquire it at bargain price if the property later increased in value, the corporations were simply providing James Akers a reasonable form of additional compensation to supplement the relatively small amounts paid to him as cash compensation for his valuable services. Thus the narrow issue remaining is whether the compensation resulting from the bargain rental and purchase of the house is taxable to James and Estelle Akers in 1976, when the option was exercised, or in 1959, when the option was granted. c. Existing Case Law and Validity of Section 1.421-6, Income Tax Regs. The Court of Appeals requested that we consider on remand petitioner-estate's argument that section 1.421-6, Income Tax Regs., exceeds the reach of existing case law and the Secretary's authority. Petitioner-estate argues that section 1.421-6, Income Tax Regs., is not a proper restatement of the law in Commissioner v. Smith, supra. It contends that the regulation demands conditions, i.e., free transferability, immediate exercisability and the absence of certain restrictions or conditions, which were not required in Smith, and that these conditions *522 were "simply factors to be considered". To the contrary, respondent contends that section 1.421-6, Income Tax Regs., is no more stringent than the conditions laid down in Smith. It is argued that "such case specifically stated that the factors set forth in the regulations were to be considered in determining whether or not an option has a readily ascertainable value". We agree with respondent. Section 1.421-6, Income Tax Regs., attempts to codify Commissioner v. Smith, supra and Commissioner v. LoBue, supra. The opinions of the Supreme Court in Smith and LoBue make it clear that the option in this case should be taxed at the time it was exercised and not at the time it was granted. The option here was not traded on an established market. It was subject to the restriction that James and/or Estelle Akers occupy the property, which restriction had a significant effect on the value of the option. In Commissioner v. Smith, supra, an employer gave to its employee as compensation for his services an option to purchase shares of stock at a price not less than the then value of the stock. The option *523 had no value at that time, and the compensation contemplated by the parties was the transfer to the employee of the shares of stock after their value had increased to more than the option price. In taxing the option on the date it was exercised, and not on the date it was granted, the Supreme Court stated, 324 U.S. at 181-182: When the option price is less than the market price of the property for the purchase of which the option is given, it may have present value and may be found to be itself compensation for services rendered. But it is plain that in the circumstances of the present case, the option when given did not operate to transfer any of the shares of stock from the employer to the employee * * *. And as the option was not found to have any market value when given, it could not itself operate to compensate respondent. It could do so only as it might be the means of securing the transfer of the shares of stock from the employer to the employee at a price less than the market value, or possibly, which we do not decide, as the option might be sold when that disparity in value existed. Hence the compensation for respondent's services, which the parties *524 contemplated, plainly was not confined to the mere delivery to respondent of an option of no present value, but included the compensation obtainable by the exercise of the option given for that purpose. It of course does not follow that in other circumstances not here present the option itself, rather than the proceeds of its exercise, could not be found to be the only intended compensation. In LoBue v. Commissioner, supra, the Supreme Court found that untransferable stock options, which were contingent upon continued employment, should not be taxed until they were exercised. The Supreme Court stated, 351 U.S. at 249: It is of course possible for the recipient of a stock option to realize an immediate taxable gain. See Commissioner v. Smith, 324 U.S. 177, 181-182. The option might have a readily ascertainable market value and the recipient might be free to sell his option. But this is not such a case. These three options were not transferable and LoBue's right to buy stock under them was contingent upon his remaining an employee * * * until they were exercised. * * * The test thus established by the Supreme Court is whether *525 the option had a readily ascertainable market value on the date it was granted. See LeVant v. Commissioner, 45 T.C. 185 (1965), revd. and remanded on another issue 376 F.2d 434 (7th Cir. 1967); Wanvig v. United States, 295 F. Supp. 882 (E.D. Wis. 1969), affd. on other grounds 423 F.2d 769 (7th Cir. 1970). If the option did not have a readily ascertainable market value on the date it was granted, then taxation takes place on the date the option was exercised. We reject petitioner-estate's contention that section 1.421-6, Income Tax Regs., is unauthorized and invalid. In Weigl v. Commissioner, 84 T.C. 1192 (1985), albeit in a different context, this Court upheld the validity of section 1.421-6, Income Tax Regs. We stated (84 T.C. at 1213-1214 and 1217): Treasury regulations are not to be rejected unless they are found to be unreasonable and plainly inconsistent with the statute, Commissioner v. South Texas Lumber Co., 333 U.S. 496, 501 (1948). Treasury regulations, "should not be overruled except for weighty reasons" ( Bingler v. Johnson, 394 U.S. 741, 750 (1969); *526 Edward L. Stephenson Trust v. Commissioner, 81 T.C. 283, 287 (1983)); and "the choice among reasonable alternatives is for the Commissioner, not the Courts." National Muffler Dealers Association v. United States, 440 U.S. 472, 488 (1979); Allen Oil Co. v. Commissioner, 614 F.2d 336, 340 (2d Cir. 1980). A significant factor in considering the validity of Treasury regulations is the length of time the regulations have been outstanding. United States v. Correll, 389 U.S. 299, 305-306 (1967); Commissioner v. Estate of Sternberger, 348 U.S. 187, 190 (1955). An application of the above standards to section 1.61-15, and to section 1.421-6, Income Tax Regs., requires a decision upholding the validity of those regulations. * * * The application of the valuation rules of section 1.421-6, Income Tax Regs., in numerous additional court decisions further supports the validity of those valuation rules, as set forth in the regulation. See, for example, Shamburger v. Commissioner, 508 F.2d 883 (8th Cir. 1975), affg. 61 T.C. 85 (1973); Mitchell v. Commissioner, 590 F.2d 312 (9th Cir. 1979), *527 affg. 65 T.C. 1099 (1976); Wanvig v. United States, 295 F. Supp. 882 (E.D. Wis. 1969), affd. on other grounds 423 F.2d 769 (7th Cir. 1970). d. Section 1.421-6, Income Tax Regs.
Section 1.421-6, Income Tax Regs. (options to which section 421 does not apply), applies generally to employee options to purchase stock of the employer or other property that was granted between February 26, 1945, and July 1, 1969. The option in this case is governed by the regulation since: (1) It was issued on or after February 26, 1945, and before July 1, 1969; (2) the option to purchase "other property"of the employer was granted to James Akers, an officer-employee of the employer-company; and (3) neither of the exceptions to the applicability of section 1.421-6(a)(2), Income Tax Regs., is present herein. Under section 1.421-6, Income Tax Regs., if an option had a "readily ascertainable fair market value" when granted, any bargain realized on the exercise of the option is not taxable even if no taxable income was reported in the year the option was granted. Sec. 1.421-6(a)(3), Income Tax Regs. Conversely, if the option did not have a readily *528 ascertainable fair market value when granted, the employee is taxed on the difference between fair market value of the property and the option price paid when the option is exercised. Sec. 1.421-6(d), Income Tax Regs. The regulation provides that the value of an option "is ordinarily not readily ascertainable unless the option is actively traded on an established market." Sec. 1.421-6(c)(2), Income Tax Regs.
Since the option in question is not a stock option and is not traded on an established market, we must decide whether the fair market value of the option granted to James and Estelle Akers can be determined with "reasonable accuracy", using the test of section 1.421-6(c), Income Tax Regs. See Mitchell v. Commissioner, 65 T.C. 1099, 1111-1112 (1976), affd. 590 F.2d 312 (9th Cir. 1979). Section 1.421-6(c)(3)(i), Income Tax Regs., provides: (3)(i) When an option is not actively traded on an established market, the fair market value of the option is not readily ascertainable unless the fair market value of the option can be measured with reasonable accuracy. For purposes of this section, if an option is not actively traded on an established *529 market, the option does not have a readily ascertainable fair market value when granted unless the taxpayer can show that all of the following conditions exist: (a) The option is freely transferable by the optionee; (b) The option is exercisable immediately in full by the optionee; (c) The option or the property subject to the option is not subject to any restriction or condition (other than a lien or other condition to secure the payment of the purchase price) which has a significant effect upon the fair market value of the option or such property; and (d) The fair market value of the option privilege is readily ascertainable in accordance with subdivision (ii) of this subparagraph. Assuming arguendo that the first two conditions of the regulation are satisfied, we turn to the third condition -- restrictions or conditions bearing on the value of the option or the property subject thereto. The option agreement reveals the disqualifying condition. The right to exercise the option was limited in time to that period during which either James or Estelle Akers remained alive, and when one or both occupied the property. A prospective purchaser's rights would be subject *530 to the actions of James or Estelle Akers because if either moved off the premises, a purchaser's rights would be valueless. We think this significant restriction contained in the option agreement has not been taken into consideration by petitioner-estate and does not support its claim that "the options (sic) granted to Mr. and Mrs. Akers had a readily ascertainable fair market value when issued." Other than its stated conclusion, petitioner-estate has failed to provide any evidence of the option's value when granted, including testimony, expert or lay, of the value amount petitioner-estate would assign to the option. Thus, the third condition of section 1.421-6(c)(3)(i), Income Tax Regs., is not satisfied. Respondent also argues that petitioner-estate has failed to establish that the fair market value of the option privilege is readily ascertainable. The "option privilege" in the case of an option to buy, as specified in subparagraph (d) above, is defined as the "opportunity to benefit * * * from any increase in the value of property" during the option period, "without risking any capital." Sec. 1.421-6(c)(3)(ii), Income Tax Regs. Three factors must be considered in determining *531 whether the option privilege has a readily ascertainable fair market value: (a) Whether the value of the property subject to the option can be ascertained; (b) The probability of any ascertainable value of such property increasing or decreasing; and (c) The length of the period during which the option can be exercised. Sec. 1.421-6(c)(3)(ii), Income Tax Regs.
Here petitioner-estate did not provide evidence in the form of expert testimony or otherwise to show that the option privilege had a readily ascertainable fair market value at the time it was granted. See Mitchell v. Commissioner, 65 T.C. at 1112-1113; Swenson v. Commissioner, T.C. Memo. 1971-88. We therefore conclude that the fair market value of the option was not readily ascertainable under section 1.421-6(c)(3)(i), Income Tax Regs., when the option was granted, but only when it was exercised. e. Conclusion
Accordingly, with respect to this issue, we hold that the bargain rental and purchase of the house constituted taxable compensation under section 61 to the Estate of James C. Akers and Estelle Akers in 1976 when the option was exercised. Specifically, they received *532 $ 3,300 in additional income resulting from their rental of the house in that year for less than fair market value, and they received additional income of $ 31,014 in 1976 as a result of the purchase of the house by Estelle Akers from Asphalt Products for less than fair market value ($ 43,000 less $ 11,986 cash paid). To reflect our conclusions on the remanded issues, Decisions will be entered under Rule 155. Footnotes
1. The following cases are consolidated herewith: William B. Akers and Jo Ann Akers, docket Nos. 6729-77, 6759-78, and 5876-80; J. Clark Akers, III and Eleanor M. Akers, docket Nos. 6734-78 and 5875-80; and Estate of James C. Akers, Estelle L. Akers, Executrix, and Estelle L. Akers, docket No. 5874-80.↩
2. Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the years in issue. All Rule references are to the Tax Court Rules of Practice and Procedure.↩
3. These cases have had a long and tortuous history. For several years counsel for the parties have attempted to settle the cases in order to implement the mandates issued by the Court of Appeals. To this end, after lengthy and extended negotiations, the parties finally agreed in a stipulation filed with this Court on January 31, 1992, that the decisions entered on September 27, 1984, in J. Clark Akers III and Eleanor M. Akers, docket No. 6717-77, and William B. Akers and Jo Ann Akers, docket No. 6729-77, are no longer contested by petitioners and "should be affirmed on remand". Also in the stipulation filed on January 31, 1992, the parties requested this Court to proceed to decide the two issues remanded to us by the Court of Appeals for reconsideration.↩
4. The Estate of James C. Akers and Estelle L. Akers will sometimes be referred to as petitioner-estate. ↩
5. We had held that petitioners Clark and William Akers did not receive constructive dividends as a result of the bargain rental and purchase transactions. See T.C. Memo. 1984-208↩.
1. The deficiencies in docket Nos. 5875-80 and 5876-80 are due to disallowed carryover charitable contribution deductions.↩
6. In the final sentence of his report, Col. Brandes rounded off his $ 210,510 appraisal to $ 210,000.↩
7. RCNLD may be useful in appraising properties other than real estate. See, e.g., Cupler v. Commissioner, 64 T.C. 946, 955↩ (1975).